[No. 19906-4-I.   Division One.   November 28, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. DION
CHRISTOPHER SUMMERS, *Appellant.*

*Karen Morth* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Greg Hubbard* and *Jonathan Love, Deputies,* for respondent.

PEKELIS, J.—Dion Christopher Summers, a juvenile, appeals from a disposition order finding him guilty of one count of second degree burglary. He contends that the trial

court erred in (1) admitting evidence discovered during a search of his room, (2) admitting a statement he made subsequent to that search, (3) failing to inform him of his rights as required by CrR 3.5(b), and (4) failing to afford him a trial by jury.

I

On June 27, 1986, Officer Ronald Beavert of the Seattle Police Department responded to a report of a burglary at the home of Vance and Patra Perkins. Beavert spoke with the Perkins and with a neighbor, Donald Horton. Horton told Beavert that he had seen two boys carrying stereo equipment down the street away from the Perkins home. One of the boys was believed to be Dion Summers, who also lived in the neighborhood.

Beavert then went to Summers' house. A woman about 30 years old answered the door and identified herself as Deborah Palmer. Palmer told Beavert that she lived in the house and that she was Summers' sister. She said that Summers was not at home, but that he and another boy had come in earlier with some stereo equipment which they put in Summers' room. Beavert asked Palmer if she would consent to a search, which she did. Beavert was then taken to Summers' room, where he found some stereo equipment which matched the description of the equipment taken from the Perkins home.

Detective Steven Macomber was assigned to the follow-up investigation. Macomber telephoned Summers' home and talked with his mother, Beverly Washington. Washington was very cooperative, and scheduled an appointment with Macomber. Five days after the burglary, on July 2, Washington and a friend of hers, Arthur Barnes, brought Summers to Macomber's office. In the presence of Washington and Barnes, Summers was informed of his *Miranda* rights and signed a 2½–page written statement.

On October 28, 1986, Summers was charged with one count of second degree burglary. He moved to suppress the evidence obtained in the search of his room, arguing that

Palmer had no authority to consent to that search. He also moved to suppress his subsequent statement, arguing that it was the fruit of the allegedly unlawful search. The court denied both motions, concluding that Palmer did have authority to consent to the search. After a bench trial, Summers was found guilty as charged.

## II

Summers first contends that the evidence obtained in the search of his room should have been suppressed because Palmer was merely a babysitter and had no authority to consent to the search. The State has the burden of establishing the lawfulness of a warrantless search. *State v. Mathe*, 102 Wn.2d 537, 540–41, 688 P.2d 859 (1984). When the State seeks to justify a warrantless search by proof of a third party's consent, it must show that the third party possessed "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 39 L. Ed. 2d 242, 94 S. Ct. 988 (1974); *see also Mathe*, 102 Wn.2d at 543; *State v. Koepke*, 47 Wn. App. 897, 902–03, 738 P.2d 295 (1987); *State v. Kendrick*, 47 Wn. App. 620, 632–33, 736 P.2d 1079, *review denied*, 108 Wn.2d 1024 (1987). "Common authority" derives from

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co–inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n.7.

■ In this case, the evidence shows that Deborah Palmer, Summers' adult sister, was not simply a babysitter, but was acting as the head of household while their mother, Beverly Washington, was away. Washington testified that she went out of town for 4 days and that she asked Palmer to stay in the house and take care of the children. Palmer

was, according to Washington, the "responsible adult" during those 4 days. Consequently, Palmer had the same authority to consent to a search of Summers' room as Summers' mother would have had. *See Grant v. State,* 267 Ark. 50, 589 S.W.2d 11, 14 (1979) (in determining validity of consent, status of one in loco parentis should be same as that of natural parent); *State v. Carsey,* 295 Or. 32, 664 P.2d 1085, 1088–89 (1983) (in determining validity of consent, relationship between grandmother and grandson treated as that of parent and child).

The issue then becomes: Could Summers' mother have validly consented to the search? Under the "common authority" rule of *Matlock,* there is no doubt that a parent may authorize a search of areas within the home to which all family members have equal access. 3 W. LaFave, *Search and Seizure* § 8.4(b), at 280–81 (2d ed. 1987). It is somewhat less clear, however, under what circumstances a parent may authorize the search of a child's room. Although the issue has not been decided in Washington, the great majority of courts which have addressed it have concluded that a parent does have authority to consent to such a search.[1] 3 W. LaFave, *Search and Seizure* § 8.4(b), at 280 (2d ed. 1987).

A number of cases take the position that a parent has the requisite authority simply by virtue of her status as a parent, even if she fails to exercise actual control over the child's room. In *In re Salyer,* 44 Ill. App. 3d 854, 358 N.E.2d 1333 (1977), for example, the 15–year–old defendant took extraordinary measures to maintain exclusive control over his room. He kept it locked from the inside with one lock and from the outside with another. He cleaned his room himself and brought his laundry out. His mother rarely entered, and when she did she had to knock to gain

---

[1]The consent of a parent has been upheld under a number of rationales, *e.g.,* in cases where the child shares his room with others, *see United States v. DiPrima,* 472 F.2d 550, 551 (1st Cir. 1973); *State v. Blair,* 638 S.W.2d 739, 750 (Mo. 1982), or where the parent, usually the mother, enters the room to clean, *see Preston v. State,* 444 So. 2d 939, 943 (Fla. 1984).

admittance. *Salyer,* 358 N.E.2d at 1334–35. Nonetheless, the court held that the mother could lawfully consent to a search of her son's room because, as a parent, she possessed "authority superior to that of her son" over the room he occupied. *Salyer,* 358 N.E.2d at 1336;[2] *see also Tate v. State,* 32 Md. App. 613, 363 A.2d 622, 626–27 (1976) (mother possessed "superior authority" over room of 17–year–old son); *Grant,* 589 S.W.2d at 14 (foster parent had right of access and control over entire premises); *United States v. DiPrima,* 472 F.2d at 551 (even if minor child thinks of room as "his", overall dominance will be in parents).

On the other hand, in *State v. Carsey,* 295 Or. 32, 664 P.2d 1085, 1093 (1983), the Oregon Supreme Court rejected the proposition that a custodial parent has an unconditional right to consent to the search of her child's room. The court said that although parental status is an important factor to consider in determining the validity of a consent search, there are other factors to consider as well. *Carsey,* 664 P.2d at 1093. Because the defendant paid rent for the room he occupied in his grandparents' home,[3] and because there was a tacit understanding that the defendant's room was under his exclusive control, the court found that the grandmother's consent to a search of the defendant's room was invalid. *Carsey,* 664 P.2d at 1089, 1093, 1095.

---

[2] Summers relies heavily on an earlier Illinois case, *People v. Nunn,* 55 Ill. 2d 344, 304 N.E.2d 81 (1973). In *Nunn,* 304 N.E.2d at 86, the court held invalid a mother's consent to a search of her son's room, finding that the son "reasonably expected" that his mother would neither enter the room herself nor allow others to enter. However, *Nunn* employed a subjective "expectation of privacy" test which has since been repudiated in favor of the more objective "common authority" test of *Matlock. See People v. Stacey,* 58 Ill. 2d 83, 317 N.E.2d 24, 27 (1974). Moreover, the continuing validity of *Nunn* seems questionable in light of *Salyer.*

[3] The defendant had been released from a halfway house into the custody of his grandparents. Accordingly, the court assumed that "the relationship between the grandmother and the grandson was essentially that of parent and child." *State v. Carsey,* 295 Or. 32, 36, 664 P.2d 1085, 1089 (1983).

Our own Supreme Court has indicated that it is more inclined to follow the approach of *Salyer* than that of *Carsey*. In *State v. Vidor,* 75 Wn.2d 607, 452 P.2d 961 (1969), the court upheld a search of the defendant's room to which his mother had consented. We recognize that *Vidor* can be distinguished from this case because there the defendant was merely a guest in his mother's home, not a resident. *See also State v. Clevenger,* 69 Wn.2d 136, 417 P.2d 626 (1966). Nonetheless, the *Vidor* court approved of the following comment in *State v. Kinderman,* 271 Minn. 405, 409, 136 N.W.2d 577, 580 (1965), *cert. denied,* 384 U.S. 909, 16 L. Ed. 2d 361, 86 S. Ct. 1349 (1966):

> We can agree that the father's "house" may also be that of the child, but if a man's house is still his castle in which his rights are superior to the state, those rights should also be superior to the rights of children who live in his house.

■ We agree with *Vidor* and *Kinderman* that normally the parent has authority over all rooms of the house, regardless of the pattern of *actual* entry into a particular room.[4] The fact that the child has exercised exclusive control over the room is not dispositive. Rather, the focus must be on the broader relationship between the parent and child. Thus, if the child is essentially dependent, it is irrelevant that the parent has tolerated the child's desire to make his room his exclusive domain. First, "toleration is not necessarily agreement." *Carsey,* at 42. More importantly, even where there is such an "agreement", it is always subject to revocation by the parent, who retains the ultimate power. By contrast, when a child is emancipated but occupies a room in the parent's home, pays rent, and otherwise manifests his independence from the parent, that child is entitled to the same protection as a tenant.

---

[4]Although *Vidor* and *Kinderman* were decided before *Matlock,* we believe that a "status" approach is not inconsistent with *Matlock.*

Whether the relationship is more like that of a dependent child and parent or that of tenant and landlord is a factual issue to be determined in each case.[5]

Thus, we hold that where the State has shown that a third party with the status of a custodial parent has consented to the search of a child's room within the house, it has carried its burden of establishing the lawfulness of the search. However, where it can be shown that the third party's status is more like that of a landlord than a custodial parent, he or she has no authority to consent to a search of the child's room.

In this case, Summers offered no evidence from which the court could conclude that his status was that of a tenant rather than a child living in his parent's home. On these facts, the trial court correctly concluded that Palmer had authority to consent to a search of Summers' room, and hence that the search was lawful. Thus, Summers' motion to suppress was properly denied.

## III

The remaining issues require little discussion. First, Summers contends that his signed statement was "tainted" by the allegedly unlawful search of his room. Hence, he argues, the statement should have been suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). However, since we have concluded that the search was lawful, we must also conclude that the statement was not tainted and that its admission was not error.

Summers also contends that the trial court's failure

---

[5]While we recognize that it may at times be difficult for a police officer to make such a determination in the field, we are also mindful that warrantless searches are intended to be the exception, not the rule. If there are exigent circumstances, the absence of a warrant is excused. Without such exigencies, we do not think it impedes the work of the police to require an officer to obtain a search warrant where there are indicia that the parent's consent to the search of a child's room may not be valid.

to inform him of his rights as required by CrR 3.5(b) requires that the case be remanded for a new hearing on the admissibility of his statement.[6] However, the sole basis for Summers' challenge to the admissibility of his statement is the alleged taint stemming from the prior search of his room. Since, as we have concluded, there was no taint, there was no basis for suppressing Summers' statement and hence no prejudice in the trial court's failure to comply with CrR 3.5(b).[7]

Finally, Summers contends that he had a constitutional right to a jury trial. He conceded in his brief that this issue would be disposed of by the Supreme Court's decision in *State v. Schaaf,* 109 Wn.2d 1, 743 P.2d 240 (1987). It has been: juvenile offenders have no right to a trial by jury. *Schaaf,* 109 Wn.2d at 22.

---

[6]CrR 3.5(a) requires that when a defendant's statement is to be offered into evidence, a hearing must be held to determine whether the statement is admissible. At that hearing, the court has the duty to inform the defendant that

(1) he may, but need not, testify at the hearing on the circumstances surrounding the statement; (2) if he does testify at the hearing, he will be subject to cross examination with respect to the circumstances surrounding the statement and with respect to his credibility; (3) if he does testify at the hearing, he does not by so testifying waive his right to remain silent during the trial; and (4) if he does testify at the hearing, neither this fact nor his testimony at the hearing shall be mentioned to the jury unless he testifies concerning the statement at trial.

CrR 3.5(b). In this case, the court did not so inform Summers.

[7]We note, moreover, that there is no issue as to the voluntariness of Summers' statement. CrR 3.5 was enacted to implement the constitutional requirement of *Jackson v. Denno,* 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A.L.R.3d 1205 (1964), which held that a defendant must be afforded a hearing on the voluntariness of his confession prior to its admission at trial. *State v. Wolfer,* 39 Wn. App. 287, 291–92, 693 P.2d 154 (1984), *review denied,* 103 Wn.2d 1028 (1985); *see also State v. Rice,* 24 Wn. App. 562, 564–65, 603 P.2d 835 (1979). However, failure to hold a 3.5 hearing does not require reversal if there is no genuine issue as to voluntariness. *See State v. Vandiver,* 21 Wn. App. 269, 272–73, 584 P.2d 978 (1978); *State v. Mustain,* 21 Wn. App. 39, 42–43, 584 P.2d 405 (1978). Thus, even if there were an issue in this case as to whether or not the statement was tainted by a prior unlawful search, Summers would not have been prejudiced by the absence of a 3.5 hearing, and a fortiori would not have been prejudiced by the court's failure to comply with the requirements of CrR 3.5(b).

Affirmed.

GROSSE and WINSOR, JJ., concur.

Review denied by Supreme Court February 28, 1989.