STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

John M. KIEFFER, Defendant-Appellant.

Supreme Court

*No. 96–0008–CR. Oral argument January 8, 1998.—Decided May 12, 1998.*

(Also reported in 577 N.W.2d 352.)

For the plaintiff-respondent-petitioner the cause was argued by *Daniel J. O'Brien,* assistant attorney

general with whom on the briefs was *James E. Doyle*, assistant attorney general.

For the defendant-appellant there was a brief by *John A. Birdsall,* and *Gonzalez, Saggio, Birdsall & Harlan, S.C.*, Milwaukee and oral argument by *John A. Birdsall*.

Amicus curiae brief was filed by *Robert T. Ruth*, Madison for the Wisconsin Association of Criminal Defense Lawyers.

¶ 1. JANINE P. GESKE, J. This review of a published decision of the court of appeals[1] presents two questions regarding authority to consent to a warrantless police search: First, did the defendant's father-in-law have actual authority to consent to a search of the loft area above the father-in-law's garage where the defendant and his wife were living? Second, even if the father-in-law lacked actual authority to consent, could the police reasonably rely upon his apparent authority to consent to a search of the defendant's living quarters in the loft? The circuit court for Walworth County, Michael S. Gibbs, presiding, inferentially concluded that the father-in-law, Robert Garlock lacked actual authority to consent, but expressly concluded that the officers acted reasonably under the circumstances in believing that the father-in-law had apparent authority to consent to the search. The circuit court therefore denied the defendant's motion to suppress evidence based on the warrantless search. The court of appeals reversed. We first conclude that the father-in-law lacked actual authority to consent to a search of the defendant's living area. Second, we conclude that the

[1] *State v. Kieffer*, 207 Wis. 2d 462, 558 N.W.2d 664 (Ct. App. 1996).

police made insufficient inquiry and thus could not reasonably rely upon the father-in-law's apparent authority to consent to a search of the defendant's living area. We therefore affirm the decision of the court of appeals.

## FACTS AND PROCEDURAL HISTORY

¶ 2. We first consider those facts known to the arresting officers at the time of the search. Early in the morning of April 9, 1995, Whitewater police arrested Scott Garlock for possession of psilocybin mushrooms, a controlled substance. *See* Wis. Stat. § 161.41(1m)(g)1.[2] Scott Garlock informed the police that he had purchased the mushrooms from John Zattera, and that Zattera had more mushrooms in his possession. Scott Garlock gave the police an address where Zattera was staying, the residence of Scott's father, Robert Garlock. Without obtaining a search warrant, Officer Scott Priebe and Sergeant Thomas Bushey of the Whitewater Police Department, and Deputy Timothy Otterbacher of the Walworth County Sheriff's Department, went to that address to look for Zattera. When they arrived at approximately 8:45 a.m., they spoke to Robert Garlock (Garlock), who identified himself as the owner of the property, including the garage and loft area.

¶ 3. The police informed Garlock that his son Scott had been arrested on a drug charge. They also

---

[2] Wis. Stat. § 161.41(1) (1995–96), as part of Chapter 161, Uniform Controlled Substances Act, was renumbered in part as Chapter 961, Uniform Controlled Substances Act, and repealed in part by 1995 Act 448, §§ 243–266, effective July 9, 1996. Amendments to Wis. Stat. § 161.41(1m)(g)1 pursuant to 1995 Act 448 do not affect the statutory violations charged in this case.

told Garlock of their suspicion that there might be drugs in the (Garlock) residence, or in the area where Zattera was staying. Garlock became upset and readily consented to let police search anywhere on the premises because "he didn't want any drugs on his property." Garlock told the officers that his daughter and son-in-law, Dawn and John Kieffer, slept in a loft area above Garlock's garage. Garlock also reported that Zattera was staying with them.

¶ 4. Before proceeding to the garage loft, the three officers asked Garlock about the living arrangements. Deputy Otterbacher asked Garlock what he owned, to which he responded the house and the loft or barn. The officers asked whether the Kieffers paid rent. Garlock replied that the Kieffers sometimes helped pay the electric bills but that there was no written lease. The police also learned that there was no plumbing in the loft, and no telephone. Later, at the suppression hearing in this case, Officer Bushey testified that he understood this information to mean that although the Kieffers slept in the loft, they used the entire house as their home:[3]

> The way I understood it they used the entire house and the loft area. The loft area is where they slept, but they came in the house to take their showers, go to the bathroom, use the phone, and I would assume

---

[3] The dissent has it backwards. The dissent looks at this information known to the officers, and asserts that "it would be reasonable for the officers to conclude that the Kieffers would have to enter Mr. Garlock's house every time they had to wash their hands, use the toilet, take a shower, brush their teeth, or even get a drink of tap water." Dissenting op. at 559. What the officers concluded about the Kieffers' actual or apparent authority to use the Garlock residence is not evidence of whether or not Garlock had access to the Kieffers' quarters.

it's where they would eat dinner. The loft area was a place that they stayed and slept.

¶ 5. Garlock then led the officers to the detached garage, approximately 15 to 20 feet behind the house. The outside door to the garage was unlocked. Garlock opened the outside garage door. There were no outside steps leading directly to the loft. Deputy Otterbacher asked Garlock how he normally entered the loft. Garlock told police that he usually knocked before entering the loft, "out of respect." With Garlock leading the way, the three officers and he then climbed up the interior stairs to the Kieffers' living quarters. At the top of the stairs was a door with a lock; it was unlocked at the time.

¶ 6. Additional facts about the use of the loft area as living space, but not relayed to the police at the time of the search, came out in testimony at the suppression hearing. The Kieffers had converted the loft area into a living space with their own money. They did so with Garlock's permission. The Kieffers considered Garlock their landlord, and were living there by Garlock's rules. As part of their agreement, Garlock would not go into loft area without asking their permission. The Kieffers had the only keys to the loft. Dawn felt that as part of the agreement, she and her husband had the right to exclude anyone, including her parents, from the loft area. Garlock testified that the Kieffers paid the utilities monthly.[4]

¶ 7. At this point, the testimony diverges regarding the manner of entry and sequence of conversation. Officer Bushey testified that Garlock poked his head in the door, and yelled to the Kieffers that the police were

---

[4] Deputy Otterbacher testified that Garlock said the Kieffers helped with the electric bill when they had money.

there and wanted to talk to them. According to Deputy Otterbacher's testimony, someone said in response to Garlock's knock "come in" or words to that effect. At the hearing Garlock testified that he didn't knock, he simply opened the door and walked into the loft. Garlock entered first. The officers followed. When Garlock entered, he took hold of the dog that was in the loft.

¶ 8. At the suppression hearing, Garlock testified as to his custom in entering the loft, and also the manner in which he entered the loft area on the day of the search:

> Q: (District Attorney Resch) And you have gone into that loft for various reasons prior to April 9th of 1994 (sic) when they were living there, correct?
>
> A: (Robert Garlock) With their permission.
>
> Q: You apparently knocked on the door like you did on April 9th?
>
> A: No, I didn't knock on the door. No.
>
> Q: You didn't knock on the door?
>
> A: No.
>
> Q: Well, how did you–
>
> A: I just walked in. Like I said, I was very upset and I just walked in.
>
> Q: And you're free and comfortable in doing that, correct?
>
> A: Yes. Considering the way I felt, yes.
>
> Q: You did not walk into that apartment because the police officers told you to go in; isn't that correct?
>
> A: No. They didn't tell me. I just told them that I would go up there. After they told me what it was all about, I told them that I would go up there and take

care of the dog because I didn't want to see anybody get hurt with the dog.

¶ 9. Once inside the loft, the officers found Zattera sleeping on a couch in the living room area. The officers also found a marijuana pipe and rolling papers on or near the coffee table in front of the couch.

¶ 10. There was a door from the living room area to a small bedroom. Garlock said "come on out," several times. Then the officers asked Kieffer and Dawn to come out. The three officers stood outside the door until Kieffer and eventually his wife walked out of the bedroom. Dawn Kieffer testified that she immediately asked whether the officers had a search warrant.[5] Officer Bushey, according to Dawn, told her they did not obtain a search warrant but relied on the consent given by her father, Robert Garlock, to enter and search the loft area. Consequently, the officers did not ask either John or Dawn Kieffer for their consent to search the living quarters.

¶ 11. The officers questioned both Zattera and John Kieffer. Kieffer initially denied knowing anything about the mushrooms. After this initial questioning, Kieffer went back into the bedroom. Officer Priebe followed him. While in the bedroom, Priebe conducted a search and found several bags containing psilocybin mushrooms. Kieffer then admitted having purchased the mushrooms from Zattera.

¶ 12. Without giving Kieffer *Miranda*[6] warnings, the officers continued to question him about his involvement with the mushrooms. Kieffer made several incriminating statements. The officers arrested

_____

[5] When they testified at the suppression hearing, none of the three officers recalled Dawn asking them about a warrant.

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Kieffer, handcuffed him and transported him to the Whitewater police station. At the station an officer read Kieffer his *Miranda* rights, which Kieffer then waived. Officer Bushey then interrogated Kieffer. Following that interrogation, Kieffer was charged with one count of possession with intent to deliver psilocybin mushrooms in violation of Wis. Stat. § 161.41(1)(g)1.[7]

¶ 13. Kieffer filed motions to suppress the physical evidence obtained in the search of the loft and to suppress the statements he made when questioned by police at both the loft and the police station. After hearings on these motions in June, 1995, the circuit court first denied Kieffer's motion to suppress the physical evidence and the motion to suppress his post-*Miranda* statement given at the police station. The court inferentially concluded that Garlock lacked actual authority to consent to a search of Kieffer's living area, but expressly held that Garlock had apparent authority to consent. The circuit court granted Kieffer's motion to suppress the statement made at the loft. Kieffer pled guilty to one count of possession with intent to deliver psilocybin mushrooms. Kieffer appealed, asserting that the circuit court should have suppressed the results of the warrantless search and his post-*Miranda* statement.

---

[7] The complaint initially charged defendant Kieffer with one count of possession with intent to deliver psilocybin mushrooms, Wis. Stat. § 161.41(1m)(g)1, violation of the controlled substance tax stamp statute, Wis. Stat. § 139.95(2), and possession of drug paraphernalia in violation of Wis. Stat. § 161.573 (1). As a result of his guilty plea, Kieffer was convicted only of the delivery charge.

All future statutory references in this opinion will be to the 1995–96 volume, unless otherwise noted.

¶ 14. The court of appeals reversed in part, and affirmed in part. First, it held that the circuit court erred when it denied Kieffer's motion to suppress the physical evidence obtained during a warrantless search, concluding that Garlock did not have actual authority to consent to a search of the loft, and that the officers could not have reasonably relied upon Garlock's apparent authority to consent to the search. *See* 207 Wis. 2d at 471. Second, the court of appeals held that Dawn Kieffer's request for a search warrant negated any consent given by Garlock. *See id.* at 471. Third, the court of appeals affirmed the circuit court's finding that the statement made while in police custody and after Kieffer had received *Miranda* warnings should not have been suppressed. The statement was not the "fruit" of a statement taken in violation of the *Miranda* requirements, nor was it the product of improper promises made by the officers to obtain Kieffer's cooperation. *See id.* at 474.

¶ 15. The State petitioned for review of the Fourth Amendment consent issue. Kieffer opposed the petition, but argued in the alternative that the issues surrounding the inculpatory statement given at the police station should also be addressed. We granted review of all issues.[8]

---

[8] In addition to the questions of whether Garlock possessed actual or apparent authority to consent to the search, the State raises two other issues on this review: If the police were lawfully inside the loft area of the garage, was the consent to search then vitiated when Kieffer's wife asked to see a search warrant even though Kieffer had himself consented to a search of the bedroom? Next, was the defendant's inculpatory statement, given to police after *Miranda* warnings at the police station, the tainted fruit of an earlier inculpatory statement given at the scene of the search in violation of *Miranda* procedures? Even

## STANDARD OF REVIEW

¶ 16. The question of whether a search or seizure is reasonable under the Fourth Amendment is a question of constitutional fact. Appellate courts decide constitutional questions independently, benefiting from the analysis of the circuit court. *See State v. Van Camp*, 213 Wis. 2d 131, 140, 569 N.W.2d 577, 582 (1997); *State v. Angelia D.B.*, 211 Wis. 2d 140, 146, 564 N.W.2d 682 (1997). The circuit court made certain findings of fact following the suppression hearing. In reviewing an order suppressing evidence, appellate courts will uphold findings of evidentiary or historical fact unless they are clearly erroneous. *See* Wis. Stat. § 805.17(2); *State v. Harris*, 206 Wis. 2d 243, 250 n.6, 557 N.W.2d 245 (1996).

¶ 17. Warrantless searches are "per se" unreasonable and are subject to only a few limited exceptions. *See Katz v. United States*, 389 U.S. 347, 357 (1967). One of those exceptions is valid third-party consent. *See United States v. Matlock*, 415 U.S. 164, 171 (1974); *Kelly v. State*, 75 Wis. 2d 303, 314, 249 N.W.2d 800 (1977). The State has the burden to prove that a warrantless search was reasonable and in compliance with the Fourth Amendment.[9] *See State v. Boggess*,

---

though the court of appeals reached the former question, we need not reach or comment upon either of these other issues because we hold that the initial entry and search was unlawful.

[9] The Fourth Amendment to the United States Constitution provides:

> [T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983). The State bears that burden of proof by clear and convincing evidence. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Kelly*, 75 Wis. 2d at 316. "As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment. . .warrant a (person) of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (quotation marks and citation omitted).

¶ 18. The United States Supreme Court, in *Matlock*, described the bounds of third-party consent to search:

> [T]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, (citations omitted) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7. As characterized by the *Matlock* Court, it is the sufficiency of the consenting individual's relationship to the premises to be searched, that the State must establish. *See* 415 U.S. at 171.

¶ 19. The State first asserts that Robert Garlock had actual, shared authority with the defendant, his son-in-law John Kieffer, to consent to a search of the

---

describing the place to be searched, and the persons or things to be seized.

garage loft. Alternatively, the State contends that the police officers reasonably believed that Garlock had apparent authority to consent to the search.

## ACTUAL AUTHORITY TO CONSENT

¶ 20. For its first assertion, the State points to the fact that there was no written lease between Garlock and the Kieffers. The Kieffers made only small payments in exchange for use of the loft space, and according to Garlock's testimony at the suppression hearing, his daughter and son-in-law stayed in the loft "under my rules." The State contends that this arrangement reflects an informal familial living arrangement typically held by courts to give parents actual authority to consent to a search of the premises.

¶ 21. Kieffer disagrees, asserting that there was no "mutual use" of the loft property and no "joint access and control for most purposes," as directed by the *Matlock* Court, between the defendant and his wife, and the Garlocks. Kieffer points to the testimony regarding Dawn's and his exclusive possession of the loft, and Garlock's testimony that he would not enter the Kieffers' home without asking their permission.

¶ 22. Kieffer essentially argues that he had a landlord-tenant relationship with his father-in-law. He contends that the payment of money from the Kieffers to Garlock, as part of the rental agreement, was not occasional but mandatory. Kieffer cites *Chapman v. United States*, 365 U.S. 610, 616 (1961), where the Court held that in the absence of the tenant's express permission, a landlord could not give valid consent to the search of a house that he had rented to another.

¶ 23. The State has cited a number of cases from other jurisdictions where a relative consented to a search, but each of them are distinguishable from the

facts here. In addition, sufficiency of the close relative's relationship to the premises is not necessarily established by the relative's familial relationship to the defendant, although that connection is a factor. *See Mears v. State*, 52 Wis. 2d 435, 440–41, 190 N.W.2d 184 (1971) (mother-son relationship was only a factor supporting the finding that the mother had at least equal rights to the use and occupancy of the home she shared with her adult son, the defendant); *see also Kelly*, 75 Wis. 2d at 315–16 (no support for proposition that non-resident of premises, albeit a relative of the property owner, has authority to consent to a search).

¶ 24. In one case relied upon by the State, a 19-year old son had a room in the basement of the family home. *See State v. Don*, 318 N.W.2d 801 (Iowa 1982). Hours after the offense was committed, but on that same day, the defendant's father consented to a police request to search the basement. Citing *Matlock*, the Iowa court agreed that the father's "authority to consent depends on whether he had common authority over defendant's living area." 318 N.W.2d at 804. The *Don* court concluded that the father had actual authority to consent based on the circumstances, including the father's insistence that no one could exclude him from any part of the house, the son paid no rent, and the trial court finding that the son lived there "as an ordinary family member." *Id.*

¶ 25. In *United States v. Duran*, 957 F.2d 499 (7th Cir. 1992), another case cited by the State, the court concluded that the defendant's wife had actual authority to consent to a search of an old farmhouse on the property. The defendant's wife never went into the old farmhouse because she believed it to be her husband's personal gym. She testified, however, that she could have gone into the farmhouse if she had wanted

to. *See* 957 F.2d at 505. The court applied the "joint access or control" requirement of *Matlock*, considered the marital relationship, and concluded that the wife "was not denied access to the old farmhouse, but (simply) made it a habit not to enter." *Id.*[10]

¶ 26. The facts in this case are distinct from those in both *Don* and *Duran*.[11] The defendant, John Kieffer, is not the child of Garlock, but is married to Garlock's daughter. The door to the Kieffers' loft has a lock, for which Kieffer and his wife have the only keys. In return for use of the living space in the loft, they pay

---

[10] Interestingly, in comparing the privacy expectations of spouses to those of other persons who share living quarters, the *Duran* court noted that the situation of an adult child living at home, as a general rule, "involve(s) privacy expectations greater than those inherent in a marriage, making it more difficult to demonstrate common authority." *United States v. Duran*, 957 F.2d 499, 505 (1992).

[11] The State also points us to the decision in *Adams v. State*, 645 P.2d 1028 (Okla. Crim. App. 1982), a case with facts similar to the present case. There, the sister of the defendant owned the property. Her brother made occasional payments to her and also agreed to perform some repairs to the property in exchange for living there. While the Oklahoma court of appeals concluded that the sister had actual authority to consent to a search of her brother's room, the court reached that conclusion with little or no analysis. The appellate court specifically noted that the defendant had provided the court with no case support for his argument against actual authority. *See* 645 P.2d at 1030. Relying not on substantive law applying the Fourth Amendment, but on the Oklahoma courts' procedural rule against considering arguments advanced without legal support, the court ruled against the defendant. *See id.* Lacking Fourth Amendment analysis, the *Adams* case is not persuasive support for a finding of actual authority to consent.

some form of rent.[12] The facts demonstrate that Kieffer and his wife have established at least a partial, separate household together in the garage loft.

¶ 27. In addition, there is not the same quantum of evidence of "joint access or control" in this case as there was in *Duran* and *Don* or as envisioned by the *Matlock* Court. Garlock testified that he knocked before entering the loft "out of respect." This testimony is indicative of a respect for the expectations of privacy held by the defendant and his wife, and not a mere "habit" of the property owner. In addition, Dawn and John Kieffer testified that they considered Garlock their landlord, and that they had a right to exclude anyone from the loft area. Therefore, Garlock could not have entered the loft "if he wanted to." The investigating officers did not ask Garlock at all about his mutual use,[13] if any, of the loft property.

---

[12] It is irrelevant for this analysis whether that money is actually used by Garlock to pay off a mortgage on the property or to pay to utility bills.

[13] As the parties point out, federal court decisions vary as to whether joint access to the premises, without a showing of mutual use, is sufficient to establish common authority to consent to a search. Compare *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991) (holding that a mother's consent to search her son's bedroom did not support a reasonable belief that she had common authority because the government made insufficient inquiry to prove that the defendant's mother ever used the bedroom even if she had access) with *United States v. Hall*, 979 F.2d 77, 78 (6th Cir. 1992) (holding that a homeowner had common authority to consent to search of the defendant's rental room where the room was never locked and the homeowner owned all of the furniture in the room, even though the homeowner never entered it when the defendant was not present) and *United States v. Rith*, 954 F. Supp. 1511, 1515–16 (D. Utah 1997) (holding that parents of an 18-year old had common

■

¶ 28. As directed by *Matlock*, we conclude that it is not reasonable to recognize under these facts that Garlock had the right to permit inspection of the Kieffers' living area in the garage loft, nor is it reasonable to recognize that the defendant had assumed the risk that his father-in-law and landlord might permit the loft area to be searched. On this basis, we conclude, as the circuit court inferentially concluded and as the court of appeals held, that Garlock's relationship to the loft premises was insufficient to constitute actual common authority to consent to a search of the Kieffers' living area.

## APPARENT AUTHORITY TO CONSENT

¶ 29. The State's second position is that even if Garlock did not possess actual authority to consent to a search of the loft area, under the police officers' reasonable belief, Garlock had apparent authority to so consent.

¶ 30. The circuit court concluded that the police were reasonable in their belief that Garlock had apparent authority to consent. Accordingly, the circuit court denied Kieffer's motion to suppress. The circuit court based its determination of apparent authority on two facts. The court was persuaded by Garlock's response to the police that Kieffer and his wife did not pay rent,

---

authority to consent to search his room where the son lived in the family home, did not pay rent, and the son introduced no evidence of an extraordinary expectation of privacy beyond what might be reasonably apparent under the circumstances). In this case where the third party consented to a search of living quarters used by an adult other than the third party's own child, we decline to ignore the element of "mutual use" as described by the *Matlock* Court.

547

but only made some payment toward the electric bill. The circuit court also determined that the officers' conduct was reasonable based on Garlock's eagerness to assist in ridding the premises of illegal drugs. In addition, the circuit court made a credibility determination, finding the officers' testimony of their conversation with Garlock more credible than Garlock's own testimony at the suppression hearing.[14]

¶ 31. The court of appeals, on the other hand, was troubled by the minimal inquiry undertaken by the officers before they accepted Garlock's authority to consent to a search. *See Kieffer*, 207 Wis. 2d at 470–71. The court of appeals pointed out that the officers, other than asking whether the Kieffers paid rent, made no further inquiries as to their use of the loft or whether Garlock ever entered the loft without first receiving the Kieffers' permission. *See id.*

¶ 32. The United States Supreme Court has recognized that even if a third party lacks actual common authority to consent to a search of the defendant's residence, police may rely upon the third party's apparent common authority to do so, if that reliance is reasonable. *See Rodriguez*, 497 U.S. at 186–87. Whether facts satisfy the constitutional requirement of reasonableness is a question of law which appellate courts review independently. *See State v. Murdock*, 155 Wis. 2d 217, 226, 455 N.W.2d 618 (1990). The question for the courts is whether the information available to the police officers at the time of the search would justify a reasonable belief that the party consenting to the search had the authority to do so. Under *Rodriguez*, this is an objective test. *See* 497 U.S. at 188–89.

---

[14] The circuit court, in commenting on Garlock's testimony, stated that Garlock "apparently had second thoughts since the day of the arrest."

¶ 33. The *Rodriguez* court cautioned that officers may not always take third-party consent to a search at face value, but must consider the surrounding circumstances. That consideration often demands further inquiry. "Even when the (consent) is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." 497 U.S. at 188. *See also, People v. Brooks*, 660 N.E.2d 270, 276 (Ill. App. Ct. 1996) (police officers may not "proceed without inquiry in ambiguous circumstances or always accept at face value the consenting party's apparent assumption that he [or she] has authority to allow the contemplated search").

¶ 34. We will uphold a circuit court's findings of historical fact unless those findings are clearly erroneous. *See Harris*, 206 Wis. 2d at 250 n.6. In this case, the circuit court found that defendant and his wife did not pay "rent," even though they did make payments toward utility bills. Based on that finding, and based on Garlock's perceived eagerness to rid his premises of drugs, the circuit court concluded that the State proved, by clear and convincing evidence, that the officers were reasonable in their belief that Garlock had apparent authority to consent.

¶ 35. We review the ultimate constitutional findings independently. *See Van Camp*, 213 Wis. 2d at 140; *Murdock*, 155 Wis. 2d at 226. In this case, we share the concern expressed by the court of appeals for the insufficient inquiry by the police into the surrounding circumstances. We conclude that the information known to the police at the time of the search was inadequate to support a reasonable belief that Garlock had

apparent authority to consent. Accordingly, we conclude that the State has not met its burden.

¶ 36. One officer asked whether the Kieffers paid rent. Garlock then volunteered that the Kieffers slept in the loft, but used the Garlocks' home for showers and the telephone. Beyond this meager information, the officers were unaware of Garlock's ability to gain access to and use the converted loft space. Garlock had no key to the interior loft door. Although there may have been occasions when the Kieffers left the interior loft door unlocked, as they did on the day of the search, the officers had no information as to whether this was a habit, or an uncommon occurrence. What they did know was that before entering the loft, Garlock always knocked. He said that he did so "out of respect."

¶ 37. Furthermore, we find troubling the circuit court's reliance, at least in part, on Garlock's emotional state at the time of the search. The officers' observation that Garlock was upset and wanted to help "rid his premises of drugs" cannot support a reasonable belief that Garlock had common authority to consent to a search of the loft area. This emotional response of a property owner sheds no light on whether that person enjoys a "mutual use of the property" and whether he or she has "joint access or control for most purposes" of that property. *See Matlock*, 415 U.S. at 171 n.7. Such a response could have reflected a general anti-drug attitude, or a reaction to the news that his son Scott had just been arrested for possession of a controlled substance. Under the circumstances of this case, Garlock's emotional reaction, by itself, did not support a reasonable belief that he possessed authority to consent to a search of the loft.

¶ 38. In order to establish a reasonable belief in Garlock's authority to consent, the police should have

made further inquiry into the sufficiency of Garlock's relationship to the loft premises. For example, the officers could have asked whether the Kieffers had the right to exclude others from entry into the loft area. The officers could have asked Garlock whether it was his normal practice to enter and exit the loft area whenever he felt like it. The officers could have asked whether Garlock considered himself to be the Kieffers' "landlord." The officers also could have asked whether the loft had a lock on the door, and if so, whether Garlock had a key to it. The officers could have asked whether Garlock made personal use of the loft area himself. As the suppression hearing testimony demonstrates, answers to these questions were "available" to the officers, had they only asked for them.

¶ 39. At oral argument, the State focused on evidence not shown by the defendant:

> One of the officers, I believe Sgt. Bushey, testified that he did not believe, based on his observations at the scene, he did not believe there was a lock on the door. Furthermore, based on his observations at the scene, he observed Mr. Zattera (sic) open the door, without even attempting, it was an unlocked door, and he just walked right in, which would lead, I would suggest, would lead a reasonable police officer to believe that Mr. Zattera, Mr. Garlock had fairly free access to this place, whether or not there was a lock. And furthermore, Dawn Kieffer, the daughter of Mr. Garlock, testified that, when asked "Do you keep it locked?" I think her answer was "Sometimes." So there is also no testimony from anyone that they refused access to Mr. Garlock at any time or that they ever told Mr. Garlock to keep people out or to keep himself out. There is no indication of any agreement or any understanding between Mr. Garlock and the Kieffers that Mr. Gar-

lock was to stay away unless allowed in by them. Again, Mr. Garlock felt he could come and go but he, out of respect, knocked on the door before entering.

Oral argument transcript. This argument relies more on "negative" evidence than on the results of a reasonable inquiry conducted by the officers. The record demonstrates that answers to those questions were available to the officers at the time of the search, if they had only asked.[15] Further, to resolve a Fourth Amendment question based on information not known to the officers at the time of the search merely because the defendant did not volunteer it would effectively shift the burden of proof.

¶ 40. The State next points to several cases discussing a "legal presumption that a child—emancipated or not—who resides with his or her parents shares common authority with the parent to consent to a search," despite the fact that defendant Kieffer is not Garlock's child. *See, e.g., Brooks*, 660 N.E.2d 270; *State v. Summers*, 764 P.2d 250 (Wash. Ct. App. 1988). Wisconsin does not recognize a presump-

---

[15] The dissent criticizes the majority for taking a "rigid approach" to the need for police officers to ask enough questions to satisfy a reasonable belief that the third party has apparent authority to consent. There is no magic "litany" of questions. However, had the investigating officers asked even one of the two questions posed by the dissent, namely whether Garlock "could enter the loft whenever he felt like it" or "could the Kieffers exclude Garlock from entering" the loft, we might well have concluded that the officers were reasonable in believing Garlock had apparent authority. *See* dissenting op. at 563. Because they did not ask pointed questions like those suggested by the dissent, the information the officers did obtain was insufficient to establish reasonable belief of consent under the Fourth Amendment.

tion of common authority to consent to a search when a defendant lives with his or her parents or close relatives. We disagree with the rationale in the foreign cases which have adopted such a presumption, as cited by the State, and decline to adopt such a presumption in a case where the defendant does not live with either of his parents.

¶ 41. For example, in *Brooks*, the Illinois court applied the presumption to facts presented by the parties' lawyers in chambers. *See* 660 N.E.2d at 275. There was no evidentiary hearing. The appellate court affirmed the denial of the defendant's suppression motion based not on facts in the record obtained through police inquiry and observation, but in essence on "negative" evidence: "The police officers did not know the defendant paid rent to his mother. There was no evidence the defendant had exclusive possession of his bedroom. No one said the room was locked in the defendant's absence, or that he had given explicit instructions not to allow anyone to enter." *Id.* at 276. Most if not all of the "negative" facts were available to the police in *Brooks*, had they inquired.

¶ 42. The presumption, as described in the *Summers* case cited by the State, is actually a qualified one. The *Summers* court relied on *Matlock* to state that "there is no doubt that a parent may authorize a search of areas within the home to which all family members have equal access." 764 P.2d at 252. The question left open by that statement was "under what circumstances a parent may authorize the search of a child's room." *Id.* The *Summers* court distinguished between consent to search of a dependent child's room from consent to search an emancipated child's room. "When a child is emancipated but occupies a room in the parent's home, pays rent, and otherwise manifests his (or

her) independence from the parent, that child is entitled to the same protection as a tenant." *Id.* at 253.

¶ 43. The very distinctions made in *Summers* convince us not to adopt a presumption of authority to consent in this case. Here, the defendant is not the child of the third party, but is an adult married to the third party's adult child. The marriage of two adults is certainly a manifestation of independence from a parent. Further, our decision in *Mears* confirms that familial relationship is but one of many factors to be considered.[16]

■

¶ 44. In Wisconsin there is no presumption of common authority to consent to a search when an adult defendant lives with his or her spouse's parents or close relatives. Because the officers in this case only asked questions regarding whether there was a written lease and whether the Kieffers paid rent, we conclude that they lacked a reasonable basis to believe that Garlock possessed apparent authority to consent to a search of the defendant's living area.

¶ 45. For the foregoing reasons, we conclude that Garlock lacked actual authority to consent to a search of the defendant's living area. In addition, we conclude that the police made insufficient inquiry and thus could not reasonably rely upon Garlock's apparent authority to consent to a search of the loft area. Our conclusions on the Fourth Amendment questions render the initial entry and search constitutionally

---

[16] We recognize the premise that as a "general matter, one spouse has the authority to consent to a search of premises jointly occupied by both spouses." *United States v. Duran*, 957 F.2d 499, 503–04, (7th Cir. 1992), citing *United States v. Matlock*, 415 U.S. 164, 170 (1974).

invalid, and thus avoid a need to address the other issues raised by the defendant.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 46. JON P. WILCOX, J. (*dissenting*). Today's decision requires this court to strike a delicate balance between two opposing interests that are inherent to constitutional considerations arising under the Fourth Amendment. On the one hand, we must attempt to avoid rules and procedures that "leave law-abiding citizens at the mercy of [police] officers' whim or caprice." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). On the other, we must also be concerned with rules and technicalities which "unduly hamper law enforcement," *id.*, by superseding the practical, day-to-day judgment of police officers in the field.

¶ 47. Not surprisingly, the accepted method of striking this balance turns on principles of "reasonableness." *See, e.g., Illinois v. Rodriguez*, 497 U.S. 177 (1990). The majority decision, though built upon this standard of "reasonableness," overlooks the fact that warrantless searches based upon the apparent common authority of a third party inherently require police officers to make on-the-scene, commonsense determinations as to the validity of that third party's common authority. As a result, the majority applies the rules governing apparent common authority in an unnecessarily rigid and impractical fashion. Accordingly, I dissent.[1]

---

[1] For purposes of this dissent, I agree with the majority that Mr. Garlock did not have actual common authority over the garage loft in this case. Therefore, this dissent addresses only the police officers' reliance upon Mr. Garlock's apparent common authority to consent to the garage loft search.

¶ 48. The United States Supreme Court has held that police may rely upon a third party's apparent common authority to consent to a search of the defendant's residence, even if that third party lacks actual common authority to do so, provided that the reliance is "reasonable." *See Rodriguez*, 497 U.S. at 186–87. The reasonableness of an officer's reliance in any given situation is determined by use of an objective standard. *See id.* at 188–189.

¶ 49. Therefore, our duty in this case is to determine whether "the facts available to the officer at the moment [of the search] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Id.* at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)) (internal quotation marks omitted). "If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid." *Id.* at 188–89.

¶ 50. This standard of reasonableness is no different from that which is ordinarily demanded of police officers in order to comply with the Fourth Amendment to the United States Constitution. *See id.* at 185–86. To fully explain this principle, it is worth quoting the *Rodriguez* court at length:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable. As we put it in

*Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L.Ed. 1879 (1949):

"Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably.

*Id.* at 185–86.

¶ 51. As the United States Supreme Court has recently emphasized, it is not possible to articulate precisely what the Fourth Amendment demands in terms of reasonableness. *See Ornelas v. United States*, 116 S. Ct. 1657, 1661 (1996). At the very least, however, it is clear that the reasonableness requirement is a "commonsense, nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (citations and internal quotation marks omitted).

¶ 52. Applying these standards of reasonableness to the case at bar, I conclude that Officer Priebe, Sergeant Bushey and Deputy Otterbacher (the "officers") reasonably relied upon Mr. Garlock's apparent common authority over the garage loft in order to conduct a warrantless search of the premises. In order to appropriately assess the reasonableness of the

officers' actions in this case, I examine the extent of their knowledge at the time of the warrantless search.

¶ 53. Before the officers entered the loft above Mr. Garlock's garage, they knew the following:

1. Mr. Garlock was the owner of the premises in question, including the house, garage and loft above the garage.

2. Mr. Garlock's daughter and her husband, Mr. Kieffer ("the Kieffers"), slept in Mr. Garlock's loft above the garage. Mr. Zattera was staying with the Kieffers at the time.

3. Mr. Garlock's garage and loft were located 15–20 feet behind his house.

4. There were no plumbing services connected to Mr. Garlock's loft. The Kieffers had to come into Mr. Garlock's home to use the shower and bathroom.

5. There was no telephone service to Mr. Garlock's loft.

6. There was no lease or agreement to pay rent between the Kieffers and Mr. Garlock.

7. There was electricity running to Mr. Garlock's loft. The Kieffers sometimes helped pay the electric bills for the loft.

8. There was no separate entrance to the loft from the outside of the garage. One had to enter the loft by first entering Mr. Garlock's garage through a door which was not locked at the time of the search.

9. Mr. Garlock usually knocked before entering the loft "out of respect."

10. The door to the loft was also unlocked at the time of the search.

¶ 54. With this knowledge, I conclude that the officers reasonably believed that Mr. Garlock had common authority over, or sufficient relationship to, the garage loft in order to authorize a warrantless search of

the premises. That is, the officers acted reasonably under the circumstances in believing that Mr. Garlock had "mutual use of the property" through "joint access or control for most purposes."[2] *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Accordingly, I conclude that the Kieffers assumed the risk that Mr. Garlock might permit the garage loft to be searched. *See id.*

¶ 55. Viewed together, the first five facts listed above, together with all logical inferences therefrom, would lead a reasonable person to conclude that the garage loft was not a separate, self-sustained living space. Mr. Garlock's garage was situated in close proximity to his actual home, and the Kieffers slept in the loft—they had no plumbing or running water to speak of. With this knowledge, it would be reasonable for the officers to conclude that the Kieffers would have to enter Mr. Garlock's house every time they had to wash their hands, use the toilet, take a shower, brush their teeth, or even get a drink of tap water.

¶ 56. These observations would in turn make it reasonable for the officers to conclude that the garage loft was more akin to a bedroom of the Garlock house, rather than a separate "home" for the Kieffers.[3] As the

---

[2] In assessing Mr. Garlock's apparent common authority, it is important not to cloud one's reasoning with the accepted conclusion that Mr. Garlock did not have actual common authority over the garage loft. In this analysis, we must examine only the reasonableness of the officers' belief that Mr. Garlock had such authority.

[3] That the garage loft was located in a building separate from the Garlock home is not dispositive in this situation, since we are concerned with Mr. Garlock's apparent common authority, not his common habitation, of the premises to be searched. *See State v. Zimmerman*, 529 N.W.2d 171, 175 (N.D. 1995)

majority recognizes, courts have afforded a legal presumption to the validity of a parent's common authority over their children's bedrooms, whether or not that child is married. *See, e.g., People v. Daniels*, 93 Cal. Rptr. 628, 631–32 (Cal. Ct. App. 1971); *People v. Brooks*, 660 N.E.2d 270, 275 (Ill. App. Ct. 1996); *State v. Packard*, 389 So. 2d 56, 58 (La. 1980); *State v. Kinderman*, 136 N.W.2d 577, 580 (Minn. 1965); *State v. Summers*, 764 P.2d 250, 253–54 (Wash. Ct. App. 1988).[4]

---

("Common authority is not restricted to a single residence or dwelling. If the third party has control over or joint access to any property, common authority exists.").

The majority seems to think that this dissent references the Kieffers' need to use the Garlock home for such everyday activities as brushing one's teeth for the purpose of determining what the officers concluded about the Kieffers' actual or apparent authority to use the Garlock residence. *See* majority op. at 535 n.3. Much to the contrary, this information is of critical importance to the officers' assessment of whether the garage loft served as a separate "home" for the Kieffers, or merely as a separate bedroom of the Garlock residence. The officers' conclusions, if any, regarding the Kieffers' actual or apparent authority to use the Garlock residence are irrelevant.

[4] Interestingly, the only reason given by the majority for declining to adopt the legal presumption which other states have adopted in these situations is that Mr. Kieffer is not the child of Mr. Garlock. *See* majority op. at 552–53, 554 ("We disagree with the rationale in the foreign cases which have adopted such a presumption, as cited by the State, and decline to adopt such a presumption in a case where the defendant does not live with either of his parents."). I find this to be an artificial distinction, because it ignores the fact that Mr. Garlock's *daughter* lived in the garage loft. Mr. Garlock's apparent common authority to consent to a search of the garage loft should not be affected merely because the defendant is not his biological son.

¶ 57. This information provides a background against which to assess the remaining five facts known to the officers at the time of the search. Analyzed together, the latter five facts listed above would alert the officers to the following: Mr. Garlock was not the Kieffers' landlord, nor could the Kieffers appropriately be labeled as "tenants." The Kieffers did not pay rent, and there was no written or oral lease—only an undefined "agreement" that the Kieffers would help to pay the utility bills from time to time. Under any reasonable interpretation of the Garlock/Kieffer living agreement, this was not an arm's-length rental arrangement.

¶ 58. Moreover, Mr. Garlock manifested his apparent common authority by leading police through his house, out the back door to the garage, through the unlocked garage door (the sole access to the loft), up the loft stairs and through the unlocked loft door at 8:45 a.m. because he was "very upset" that "drugs were on [his] property."

¶ 59. Together, these facts would lead the officers to reasonably believe that Mr. Garlock could enter the

I also note that many courts have upheld searches of a defendant's residence when consent for that search was given by a relative other than the defendant's parents. See Timothy E. Travers, Annotation, Admissibility of Evidence Discovered in Search of Defendant's Property or Residence Authorized by Defendant's Adult Relative Other Than Spouse—State Cases, 4 A.L.R. 4th 196, §§ 13–19 (1981) (reviewing cases which have upheld third-party consent searches authorized by brothers; sisters; grandparents; fathers-, mothers-, brothers-, and sisters-in-law; and cousins). If the majority declines to adopt such a presumption, it should do so based upon the merits of that presumption and not upon the artificial distinction which it advances today.

garage loft at will, even if that belief was ultimately a mistaken one. Although Mr. Garlock told the officers that he usually knocked "out of respect," this fact could lead an officer to reasonably conclude that Mr. Garlock was not obligated to knock, but did so merely to respect the privacy of his daughter and son-in-law.

¶ 60. Looking at all of the facts known to the police at the time of the search, then, I conclude that it was reasonable for the officers to believe that Mr. Garlock had common authority over his garage loft. In this case, the officers did not simply "accept at face value the consenting party's apparent assumption that he has authority to allow the contemplated search." *See* majority op. at 549 (quoting *Brooks*, 660 N.E.2d at 276). To the contrary, the officers made a commonsense determination, acting on facts leading sensibly to their conclusion, that Mr. Garlock had common authority over his garage loft.

¶ 61. Unfortunately for the police officers of this state, the majority concludes that at least 6 more questions should have been asked by the officers when they arrived at the Garlock home:

1. Whether the Kieffers had the right to exclude others from entry into the loft area.

2. Whether it was Garlock's normal practice to enter and exit the loft area whenever he felt like it.

3. Whether Garlock considered himself the Kieffers' "landlord."

4. Whether the loft door had a lock on it.

5. Whether Garlock had a key to the loft door.

6. Whether Garlock made personal use of the loft area himself.

*See* majority op. at 551.

¶ 62. Not only does the majority emphasize that the police officers failed to ask this litany of questions,

562

but it goes to great lengths to illustrate that these specific legal questions must be asked directly. *See* majority op. at 552, 554 ("The record demonstrates that answers to those questions were available to the officers at the time of the search, if they had only asked."); ("Because the officers only asked questions regarding whether there was a written lease and whether the Kieffers paid rent, we conclude that they lacked a reasonable basis to believe that Garlock possessed apparent authority to consent to a search of his son-in-law's living area.").

¶ 63. Such a rigid approach which requires police officers to ask all of the "right" questions inappropriately reduces the discretion and judgment of police officers in the field. Without such discretion, and the ability to draw all logical inferences from what they observe at the scene, officers will be compelled to act more as "legal technicians" than police officers. *Ornelas*, 116 S.Ct. at 1661. Nevertheless, the majority frowns upon the use of "negative" evidence to reach a reasonable conclusion as to a third party's common authority over the premises to be searched. *See* majority op. at 552–53. I conclude that "negative" evidence, though not dispositive on its own, can often be helpful when coupled with "positive" evidence to support an officer's conclusions.

¶ 64. In this case, the officers received all of the information discussed above, and did not receive any information that would contradict their beliefs, such as an indication that Mr. Garlock could not enter the loft area whenever he felt like it, or that the Kieffers could rightfully exclude Mr. Garlock from entry. Under these circumstances, it was reasonable for the officers to conclude that, ultimately, Mr. Garlock could enter the loft if he desired to. I respectfully dissent.

¶ 65. I am authorized to state that Justice Donald W. Steinmetz and Justice N. Patrick Crooks join this dissent.

Jerrold A. BOROWSKI and Jerrold A. Borowski, Personal Representative of the Estate of Anthony P. Borowski, Plaintiffs-Appellants,

v.

FIRSTAR BANK MILWAUKEE, N.A., Defendant-Respondent,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY and Allstate Insurance Company, Defendants.

Court of Appeals

*No. 96–3277. Oral argument January 8, 1998.—Decided February 10, 1998.*

(Also reported in 579 N.W.2d 247.)

■■■■■■■■■■

■■■■

■■■■■■■■■

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *James J. Winiarski* of Milwaukee. There was oral argument by *James J. Winiarski*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Andrew N. Herbach* of *Howard, Solochek & Weber, S.C.*, of Milwaukee. There was oral argument by *Andrew N. Herbach*.

Before Fine, Schudson and Curley, JJ.

FINE, J. Jerrold A. Borowski, individually and as personal representative of the estate of his father, Anthony P. Borowski, appeals from the trial court's grant of summary judgment to Firstar Bank Milwaukee dismissing Borowski's negligence action against Firstar Bank. Borowski claimed that Firstar Bank negligently paid forged checks drawn on both the estate's account and his personal account by Lisa Kaczmarek, the woman whom he thought he was going to marry, and that Firstar Bank negligently honored other requests for money she made, including forged notes that asked Firstar Bank to send cashier's checks to Borowski's home, where she intercepted them. The trial court held that Borowski did not comply with his contractual obligation to timely notify Firstar Bank that there was something wrong, and that this was a condition precedent to Borowski's suit against Firstar Bank. We affirm in part and reverse in part.

■■■

Summary judgment is used to determine whether there are any disputed facts that require a trial, and, if

not, whether a party is entitled to judgment as a matter of law. RULE 802.08(2), STATS.; *U.S. Oil Co., Inc. v. Midwest Auto Care Servs., Inc.*, 150 Wis. 2d 80, 86, 440 N.W.2d 825, 827 (Ct. App. 1989). Although assisted by the trial court's written decision, our review of a trial court's grant of summary judgment is *de novo. See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

The facts material to this appeal are not disputed. Borowski maintained two accounts with Firstar Bank—his account and the account for his father's estate. According to an affidavit submitted to the trial court by Borowski in opposition to Firstar Bank's motion for summary judgment, Kaczmarek "systematically took approximately $100,000" from the estate's account with Firstar Bank, and "approximately $50,000" from his personal account with Firstar Bank. Borowski's affidavit accused Kaczmarek of using "forged checks, telephone transfers, and forged handwritten notes which she left in the overnight depository boxes at Firstar's branch banks, requesting that they send cashiers check[s] for various sums" to him, which she intercepted.

This appeal is governed by provisions of Wisconsin's Uniform Commercial Code that were in effect during the time relevant to this appeal, specifically Chapter 404, STATS., 1991–92.[1] Section 404.406(4), STATS., 1991–92, relieved a bank of liability for a customer's "unauthorized signature or any alteration" on an "item" if the customer did not timely "discover and report" it.[2] The period specified in § 404.406(4) for such discovery and report is "within one year from the time

---

> Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (sub. (1)) discover and report the customer's unauthorized signature or any alteration on the face or back of the item or does not within 3 years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration.

This provision is now found at § 404.406(6), STATS., 1995–96, and has been modified as follows:

> Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year ~~from the time~~ after the statement ~~and~~ or items are made available to the customer ~~(sub. 1)~~ discover and report the customer's unauthorized signature on or any alteration ~~on the face or back of the item or does not within 3 years from that time discover and report any unauthorized indorsement~~ on the item is precluded from asserting against the bank ~~such~~ the unauthorized signature ~~or indorsement~~ or such alteration. If there is a preclusion under this subsection, the payer bank may not recover for breach of warranty under s. 404.208 with respect to the unauthorized signature or alteration to which the preclusion applies.

1995 Wis. Act 449, § 84 (additions indicated by underlining, deletions indicated by interlineation). There is no substantive difference for the purpose of this appeal between § 404.406(4), STATS., 1991–92, and § 404.406(6), STATS. All references to "§ 404.406(4)" are to the 1991–92 edition of the statutes.