STATE of Wisconsin, Plaintiff-Respondent,

v.

Roemie T. ST. GERMAINE, Defendant-Appellant.†

Court of Appeals

*No. 2006AP2555–CR. Submitted on briefs May 1, 2007.
—Decided August 14, 2007.*

2007 WI App 214

(Also reported in 740 N.W.2d 148.)

† Petition to review denied 11/5/07.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Rex R. Anderegg* of *Anderegg & Mutschler, LLP*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *David J. Becker*, assistant attorney general.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. CURLEY, P.J.   Roemie T. St. Germaine appeals from the judgment of conviction entered after he pled no contest to one count of manufacture of more than four but less than twenty plants containing tetrahydrocannabinols (marijuana), contrary to WIS. STAT. §§ 961.14(4)(t) and 961.41(1)(h)2. (2001–02).[1] St. Germaine contends that in denying his motion to suppress evidence that police discovered after a warrantless entry into a room that he was renting, the trial court incorrectly concluded that the officers' entry was lawful. Because we conclude that there was valid consent

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

for the warrantless search of St. Germaine's room such that there was no violation of his Fourth Amendment protections, we affirm.

## I. BACKGROUND.

¶ 2. In December 2004, several Milwaukee police officers went to a residence at 1015 East Potter Street in an attempt to locate a homicide suspect, Lorenzo Balli. The officers had received information that Balli's uncle, Michael Salazar, lived at the residence and may have information regarding the whereabouts of Balli, for whom the officers had an arrest warrant.

¶ 3. The officers arrived at the residence and the property owner, Jean Briseno, answered the door, which led into the kitchen. Briseno was cooking breakfast for St. Germaine and Terry Bird at the time of the officers' arrival. One of the officers identified himself and informed Briseno that they were there looking for Balli. Briseno told the officers that she had not seen Balli for several months and that she believed he might be in Mexico. She also informed the officers that Salazar was her ex-boyfriend and that he no longer lived there.

¶ 4. Briseno then allowed the police officers to enter her kitchen where St. Germaine and Bird were seated at a table. One of the officers confirmed that Briseno was the property owner and proceeded to determine the identities of Bird and St. Germaine and their relation to the property and Briseno. Briseno informed the officer that St. Germaine rented a room in the home; however, no other information about the renting relationship was provided at that time.

¶ 5. While they were talking in the kitchen, the officer and Briseno spoke in a conversational tone with no concern for other people in the room hearing their

discussion. The officer asked if they could search the home for Balli, and Briseno consented, signing a statement that read: "I, Jean A Briseno, give the Milwaukee Police Department consent to check my residence for Lorenzo S Balli, guns, drugs and contraband, dated 12–19 '04."

¶ 6. St. Germaine, who remained seated in the kitchen during the exchange between the officer and Briseno, did not voice any objection to the search or its scope, either while Briseno was giving consent or while the search was occurring. Additionally, Briseno never told the officers they could not look in St. Germaine's room.

¶ 7. After the consent statement was signed, one officer remained in the kitchen with Briseno, Bird, and St. Germaine, while the other officers began searching the home. One of the officers testified that as he was going upstairs to search, he smelled fresh marijuana. Once upstairs, the officers came upon three rooms. The first room, St. Germaine's, had a closed door, and the remaining two doors were open. The officers began to clear the rooms, to determine whether Balli was present. In so doing, one officer remained at the closed door, while another officer cleared the two rooms with open doors. The officer by the closed door held the door knob because it was perceived as an unknown threat.

¶ 8. After the two rooms with open doors were cleared, one of the officers attempted to turn the knob to the closed door, but the handle was locked. The officer then gave the door "a slight push" and it opened; he testified that the door required no more force than normally used to open a door. Upon opening the door, the officers observed a large florescent light and ten to fifteen potted marijuana plants that were approxi-

514

mately two or three feet tall. The room also contained two humidifiers and no bed.

¶ 9.  St. Germaine was subsequently charged with the manufacture of more than four but less than twenty plants containing tetrahydrocannabinols (marijuana) in violation of WIS. STAT. §§ 961.14(4)(t) and 961.41(1)(h)2. He filed a motion to suppress, alleging that the evidence was obtained pursuant to an unlawful search.

¶ 10.  At the hearing on St. Germaine's motion to suppress, Briseno testified that St. Germaine rented the room for fifty dollars a week, that she could not enter the room without St. Germaine's permission, and that he had the only key for the single passage key lock on the door. However, Briseno admitted that she did not identify for the police officers which room was rented by St. Germaine prior to giving her consent:

Q  All right. Before the police asked you to sign their memo book, you had told them that the defendant rented a room there, right?

A  Yes.

Q  Did you tell them what room?

A  No.

. . . .

Q  . . . In the memo book when you signed it, you didn't say "except Roemie's room" —

A  No.

Q  — right? You didn't say, "except the room at the top of the stairs"?

A  No.

515

Q  You didn't say, "except the room that I'm not allowed to go in"?

A  No.

Q  Did you convey to the police at all that you weren't supposed to go in his room?

A  No. It wasn't asked.

. . . .

Q  So just so I'm clear, other than telling the police that the defendant rented a room, you didn't convey any information to them that they were not supposed to go in the room at the top of the stairs [i.e., St. Germaine's room].

A  No.

Briseno also testified that at some point after the officers had first gone up the stairs, one officer came down and asked if anyone had a key for the locked door.

¶ 11.   The officer who was present in the kitchen with Briseno, Bird, and St. Germaine while the other officers searched the home acknowledged that it was possible an officer came back down the stairs to ask for a key, but he did not recall it. The officer who pushed open the door to St. Germaine's room also conceded that it was possible that an officer had asked for a key, but could not confirm whether such a request was made because, at the time, he was concerned with clearing the two open rooms. He further stated that, although it was possible that it was learned that the door was locked prior to his returning to open it, it was not probable because, during a search for a felony suspect, officers are trained to leave such a door closed until all rooms with open doors are cleared.

¶ 12.   The trial court found the police officers who testified to be credible and denied St. Germaine's mo-

tion to suppress. The trial court accepted St. Germaine's plea of no contest and sentenced him to three months in the House of Corrections with Huber work release privileges and a six-month suspension on his driver's license. St. Germaine now appeals the judgment of conviction.

## II. ANALYSIS.

¶ 13.   St. Germaine contends that the warrantless search of his rented room was unlawful because it was without his consent and because Briseno had neither actual nor apparent authority to consent on his behalf. Consequently, St. Germaine claims that the trial court erroneously denied his motion to suppress the evidence that was obtained pursuant to the search. The State concedes that Briseno did not have actual authority. Therefore, at issue is whether Briseno had apparent authority to consent to a search of St. Germaine's room.

██

¶ 14.   "In reviewing a trial court's ruling on a motion to suppress evidence, the trial court's findings of fact will be upheld unless they are clearly erroneous. Whether a search or seizure passes constitutional muster, however, is a question of law subject to *de novo* review." *State v. Eckert*, 203 Wis. 2d 497, 518, 553 N.W.2d 539 (Ct. App. 1996) (citations and quotations omitted). Both the Fourth Amendment to the United States Constitution and article I, section 11, of the Wisconsin Constitution provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV; WIS. CONST. art. I, § 11.

¶ 15. While, as a general rule, a warrantless search is per se unreasonable under the Fourth Amendment, there are exceptions. *State v. Ziedonis*, 2005 WI App 249, ¶ 13, 287 Wis. 2d 831, 707 N.W.2d 565 (citation omitted); *see also Katz v. United States*, 389 U.S. 347, 357 (1967).[2] One such exception is valid third-party consent from one who has common authority over the premises involved. *See United States v. Matlock*, 415 U.S. 164, 171 (1974).

¶ 16. In *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990), the United States Supreme Court expanded the third-party consent exception to include situations where a warrantless entry is based upon the consent of a third party reasonably believed by the police, at the time of the entry, to possess apparent common authority over the premises, but who in fact does not. A determination as to whether reliance is reasonable under such circumstances rests on the following objective standard:

> [W]ould the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Id.* (citation and quotations omitted). The State bears the burden of proving by a preponderance of the evidence that the search and seizure falls within the

---

[2] "We traditionally follow the United States Supreme Court's interpretation of the Fourth Amendment in construing the search and seizure provision of the state constitution." *State v. Matejka*, 2001 WI 5, ¶ 17 n.2, 241 Wis. 2d 52, 621 N.W.2d 891.

third-party consent exception. *State v. Stout*, 2002 WI App 41, ¶ 10, 250 Wis. 2d 768, 641 N.W.2d 474.

¶ 17.   St. Germaine argues that there was no reasonable basis for the officers to search his room because they knew it was rented and that Briseno could not consent. However, "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . *is not that they always be correct,* but that they always be reasonable." *Rodriguez*, 497 U.S. at 185 (emphasis added).

¶ 18.   To support his position, St. Germaine relies on *State v. Kieffer*, 217 Wis. 2d 531, 577 N.W.2d 352 (1998). In so doing, however, St. Germaine overlooks a critical difference between the facts of the instant matter and the facts at issue there. In *Kieffer*, the Wisconsin Supreme Court addressed whether a father-in-law had apparent authority to consent to a search of his daughter and son-in-law's living quarters in a loft that the father-in-law owned. *Id.* at 547–55. In that case, police officers went to the father-in-law's residence and advised him that they suspected there might be drugs present in the residence or in the loft area located above the father-in-law's garage. *Id.* at 534–35. The father-in-law subsequently consented to have the police search the premises and led the officers to the detached garage behind his residence and into the loft area. *Id.* at 535–36. Neither the daughter nor the son-in-law were present for or privy to the exchange between the father-in-law and the police officers prior to their entry into the loft area. *See id.* at 538 (the daughter and son-in-law were in the loft when the police entered). Once inside the loft, the police officers "found several bags containing psilocybin mushrooms."

*Id.* The *Kieffer* court concluded that the police officers' reliance on the information known to them at the time of their search fell short of supporting a reasonable belief that the father-in-law had apparent authority to consent. *Id.* at 549–50. Rather, the holding in the case was that the daughter and son-in-law had established a separate household. *Id.* at 546.

¶ 19.   Unlike the circumstances in *Kieffer*, St. Germaine was present in the kitchen and overheard the entire exchange that took place between the officers and Briseno, during which Briseno told the police officers that St. Germaine rented a room (without identifying which room) and consented to a search of the entire premises without limitation. *See United States v. Elam*, 441 F.3d 601, 604 (8th Cir. 2006) (where "a third party with apparent authority gives unequivocal consent, and the defendant is present and fails to disclose a superior privacy interest and object to a search," the silence makes it "objectively reasonable" for the officers to believe that they had consent); *cf. State v. Matejka*, 2001 WI 5, ¶ 37, 241 Wis. 2d 52, 621 N.W.2d 891 (concluding that the owner of a vehicle.had the capacity to consent not only to a search of the vehicle but also to the search of a jacket that a passenger had brought into the vehicle, and finding support for its conclusion based on the fact that the passenger was present and aware that the owner had consented to a search of the interior of the vehicle and yet, the passenger "made no attempt to circumscribe the scope of the search to exclude her jacket").

¶ 20.   In further support of the State's position that Briseno had apparent authority to authorize the search of the entire house, including St. Germaine's room, there is nothing in the record to indicate that St. Germaine's room was identified for the officers. In this

regard, Briseno testified at the hearing on the St. Germaine's motion to suppress as follows:

Q  So just so I'm clear, other than telling the police that the defendant rented a room, you didn't convey any information to them that they were not supposed to go in the room at the top of the stairs [i.e., St. Germaine's room].

A  No.

Consequently, there was no way for the police officers to distinguish St. Germaine's room from the rest of the house for which they had consent to search. Based on these circumstances, we conclude that St. Germaine's silence served as a tacit affirmation supporting the police officers' reasonable belief that Briseno had the apparent authority to provide such consent.[3]

¶ 21.  The trial court concluded that the police officers were reasonable in believing that Briseno had apparent authority because it was "clear from what [Briseno] told the officers and the way she signed the memo book and what she did not tell the officers . . . that a reasonable officer would believe she had had the authority to grant the consent to search all the rooms upstairs." We agree. St. Germaine's silence, coupled with Briseno's conduct, bolstered the reasonableness of the police officers' belief. St. Germaine was present in the kitchen, heard the police officer ask Briseno for permission to search the house, and did not object. We conclude that St. Germaine's silence, in the face of Briseno's consent, made it reasonable for the officers to believe they could search everywhere in the house, including his locked room.

---

[3] St. Germaine does not deny that he heard the exchange between Briseno and the police officer. Similarly, there is no indication that he was unaware that Briseno provided consent.

¶ 22. In *United States v. West*, 321 F.3d 649, 650–51 (7th Cir. 2003), police officers stopped a vehicle and the driver consented to a search. The passenger in the vehicle was told that the driver consented and said nothing. *Id.* at 651. While conducting the search, an officer found a duffel bag, and the passenger advised the officer that he owned the bag; however, before this information was relayed to the police officer who had located the bag, cocaine was discovered inside. *Id.* The Seventh Circuit Court of Appeals concluded that the issue of whether the seizure of the cocaine comported with the Fourth Amendment was dependent on the following:

> It is whether [the passenger] revoked the driver's consent to search the entire car, necessarily including the bag. By [the passenger's] silence in the face of [the driver's] consent [the passenger] forfeited any right to claim that [the driver's] consent was ineffective to authorize the search because the bag was his. [The passenger's] silence was confirmation or ratification of [the driver's] authority to consent.

*Id.* at 651–52 (citations omitted).

██

¶ 23. Just as in *West*, here, St. Germaine's silence was "confirmation or ratification" of Briseno's authority to consent. *See id.* As a result, by his silence, in the face of Briseno's consent, we conclude that St. Germaine forfeited any right to claim that Briseno's consent was ineffective to authorize the search of his room. *See id.*; *cf. Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (holding that "a physically present co-occupant's *stated* refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him") (emphasis added). We find that, in this situation, where a renter sat silently while the owner of the residence

consented to a search of the entire residence without exclusion, the circumstances were such that a reasonable person would believe that the owner had authority to consent.[4]

¶ 24. Because the police officers reasonably believed that Briseno had authority to consent to the search, the officers' actions were justified under the consent exception to the warrant requirement. Therefore, the trial court's denial of St. Germaine's motion to suppress was not clearly erroneous. Accordingly, we affirm.[5]

---

[4] This holding does not create a presumption "that a search is reasonable unless a defendant produces information to rebut the presumption," as St. Germaine contends. Instead, we reference St. Germaine's silence only insofar as it is supports the reasonableness of the police officers' belief that Briseno had apparent authority to consent.

In addition, we are cognizant of the holding in *State v. Johnson*, 177 Wis. 2d 224, 234, 501 N.W.2d 876 (Ct. App. 1993), that "[c]onsent cannot be found by a showing of mere acquiescence." *Id.* (citation and quotations omitted); *see also State v. Phillips*, 209 Wis. 2d 559, 566 n.3, 563 N.W.2d 573 (Ct. App. 1997), *rev'd on other grounds*, 218 Wis. 2d 180, 577 N.W.2d 794 (1998). In *Johnson*, we concluded that a warrantless police entry was unconstitutional where "[n]othing in the record provide[d] any basis upon which consent reasonably could have been inferred." *Id.*, 177 Wis. 2d at 233–34. The circumstances in this case are distinguishable given that the record here provides a basis upon which consent could have been inferred—i.e., Briseno's signed statement consenting to the search—which amounts to far more than "a showing of mere acquiescence." *See id.*

[5] St. Germaine separately asks this court to vacate the judgment of conviction and reverse the trial court's denial of his suppression motion based on the alternative theories offered by the trial court to support its decision. In addition to finding that the officers had apparent authority to enter St. Germaine's

*By the Court.*—Judgment affirmed.

room, the trial court relied on the protective sweep theory and concluded that "St. Germaine had no expectation of privacy at all in the room once he converted it into a clearly and solely criminal purpose." As we have already explained, we are affirming on the basis that Briseno had apparent authority to consent; therefore, we need not discuss whether the trial court's alternative theories further support the search. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to decide non-dispositive issues).