STATE of Wisconsin, Plaintiff-Respondent,

v.

David D. RAMAGE, Defendant-Appellant.†

Court of Appeals

*No. 2009AP784–CR. Submitted on briefs May 7, 2010.*
*—Decided May 18, 2010.*

2010 WI App 77

(Also reported in 784 N.W.2d 746.)

† Petition for Review denied w/o costs on 7/21/10.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Kevin J. Mulrooney*, Sheboygan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Sarah K. Larson*, assistant attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. FINE, J. David D. Ramage appeals a judgment entered on pleas permitted by *North Carolina v. Alford*, 400 U.S. 25, 32–37 (1970) (A defendant may accept conviction even though he or she protests innocence.), *see State v. Garcia*, 192 Wis. 2d 845, 857–858, 532 N.W.2d 111, 115–116 (1995) (*Alford* pleas are permitted in Wisconsin.), convicting him of eight counts of unlawfully possessing child pornography, *see* WIS. STAT. § 948.12(1m), and the order denying his motion for reconsideration.[1] According to the criminal complaint, which was used as the factual bases for Ramage's pleas, the child pornography was on two computers that he owned. He contends that they were seized and searched unlawfully.[2] We affirm.

---

[1] The Honorable Jeffrey A. Wagner presided over the suppression and plea hearings, and the Honorable M. Joseph Donald presided over the final sentencing and the postconviction proceedings.

[2] A person may appeal an order denying a motion to suppress even though that person has accepted conviction. WIS. STAT. § 971.31(10).

# I.

¶ 2. The facts here are essentially not disputed. At the beginning of the evidentiary hearing on Ramage's motion to suppress the child-pornography images, he and his lawyer agreed that:

- On April 21, 2005, he was living with Sarah Folger.

- He owned the computers seized and searched by the police.

- "[H]e would occasionally allow [Folger] to use both of those computers, and that both computers did not have a password that was needed in order to use them and she would not have to sign in with a password."

This was confirmed by a Milwaukee police detective, who was the only person to testify at the suppression hearing. The detective told the circuit court that he went to the Ramage/Folger apartment on April 21 because he had been asked to go there by a man who was tutoring Folger to help her get a "GED" as part of a social-service agency's program.[3] The tutor was at the Ramage/Folger apartment when the detective arrived. The detective surmised that Folger was around twenty-three years old at the time.

¶ 3. There were two computers in the apartment—a laptop in Ramage's bedroom, and a desktop computer in the living room, which was the apartment's common area. Folger had her own bedroom in the apartment. She told the detective that she was

---

[3] "GED" is the acronym for "general educational diploma" or general high-school "equivalency diploma." *See State ex rel. Saenz v. Husz*, 198 Wis. 2d 72, 74–75 & n.1, 542 N.W.2d 462, 463 & n.1 (Ct. App. 1995).

allowed to use both computers. She also told him "that the computer might contain some sexual stories and possible child pornography." She said, however, that she had not seen any child-pornography images on either computer.

¶ 4. Ramage does not dispute that Folger gave the detective permission to look at the computers, and she signed a mostly pre-printed consent form, which, as material, authorized the detective "or any law enforcement officer, to conduct a complete search of . . . [m]y premises, and all property found therein, located at [the apartment's address] [and] [m]y personal computer(s), electronic storage devices, peripheral data storage devices, manuals, books and any other related materials to include an examination of any data stored." The detective testified that Folger and her tutor went into Ramage's bedroom to get the laptop, which had a broken screen. The detective took the computers to the police department where law-enforcement personnel discovered the child pornography.[4] The police did not have a search warrant, either at the Ramage/Folger apartment or when they later accessed the computers.

¶ 5. Ramage was out of town on April 21, and, according to the detective, Folger was "concern[ed] . . . that David Ramage would find out that the police were

---

[4] The Record is not clear whether the detective took both or just one of the computers. The transcript of his testimony at the suppression hearing has him using the singular by saying that he "took the computer to the Milwaukee Police Department and an examination revealed child pornography." As we noted in the main body of this opinion, however, the criminal complaint refers to two computers on which the child-pornography images were found. It is immaterial to our analysis whether the detective took, and the department examined, one or two computers.

called and she wanted to make sure that he was not aware that any of the computers were accessed, so that was her primary concern and her request was that it be returned prior to his arrival back to the residence that subsequent week."[5] Ramage returned in the early morning of April 26 and was arrested shortly after noon on that day outside of his apartment building.

¶ 6. As we have seen, the circuit court denied Ramage's motion to suppress the child-pornography images discovered when the police examined his computers. It ruled that since the computers were not protected by a password and Folger had free access to them, she was able to consent to their search and seizure. Although Ramage concedes on appeal that, as phrased by his main brief on this appeal, "Folger gave voluntary consent, and that she could legally consent to a search of the apartment and personal property therein," he contends that she could not consent to the detective taking the computers to the police department, and, also, that the subsequent search of those computers for child pornography was unlawful because the police did not have a search warrant authorizing that search. As we discuss below, we disagree.

## II.

¶ 7. As noted, the police did not have a search warrant when the detective took Ramage's computers to the police department, and the police did not have a

---

[5] The transcript's use of the singular "it" in the sentence fragment "that it be returned" also makes the Record unclear. As noted in the preceding footnote, however, it is not material to our analysis whether the detective took, and the department examined, one or two computers.

search warrant when they found child-pornography images on the computers. The law is settled that under the Fourth Amendment "[w]arrantless searches are 'per se' unreasonable and are subject to only a few limited exceptions." *State v. Kieffer*, 217 Wis. 2d 531, 541, 577 N.W.2d 352, 357 (1998) (quoted source omitted). One of the long-recognized exceptions is "valid third-party consent." *Ibid.* When that is an issue, the State must prove valid third-party consent "by clear and convincing evidence." *Id.*, 217 Wis. 2d at 542, 577 N.W.2d at 357. As we have seen, Ramage does not contest that Folger validly consented to the search of their joint apartment and, as phrased by his main brief on this appeal, that Folger "could legally consent to a search of the . . . personal property therein." The nub of Ramage's complaint is that he owned the computers and the police therefore violated his "possessory interest" when the detective took them and had them examined at the department rather than examining them at the Ramage/Folger apartment. In support of this contention, he relies mainly on two decisions, one from Illinois and the other from Montana that adopted the Illinois decision's reasoning.

¶ 8. The key decision on which Ramage relies is *People v. Blair*, 748 N.E.2d 318 (Ill. App. Ct. 2001). There, deputy sheriffs arrested Blair for disorderly conduct because he was videotaping children at a zoo. *Id.*, 748 N.E.2d at 322. They then went to Blair's house and asked Blair's father, with whom Blair lived, whether they could look around. *Ibid.* The father agreed, and the deputies found the son's computer in a common area. *Ibid.* One of the deputies turned the computer on and saw "bookmarks . . . [with] references to teenagers and so forth" that indicated to the deputies that the computer might have child-pornography im-

ages. *Id.*, 748 N.E.2d at 322–323 (internal quotation marks omitted). They took the computer from the house and later discovered "16 files capable of displaying a video or still image depicting either a lewd exhibition of a minor or a minor engaged in a sexual act." *Id.*, 748 N.E.2d at 322.

¶ 9. In holding that the detectives had violated the Fourth Amendment by taking the computer from Blair's house, *Blair* reasoned that irrespective of whether the father's consent to search the house permitted the deputies to turn on the computer, they did not have the right to take the computer out of the house because the son was the computer's sole owner and its contraband nature was not immediately apparent. *Id.*, 748 N.E.2d at 323–325. *Blair* distinguished the Fourth Amendment's protection of the right to privacy, which can be breached by a valid third-party consent, from the Fourth Amendment's protection of a person's possessory rights to his or her property: "While one who permits a third party access or control over his property has a diminished expectation of privacy, the third party's access or control does not similarly diminish the owner's expectation that he will retain possession of his property." *Id.*, 748 N.E.2d at 325. Relying on *Blair*, *State v. Lacey*, 204 P.3d 1192, 1204–1206 (Mont. 2009), also held that there was a distinction between a person's right to privacy in his or her property and that person's right to prevent others from interfering with his or her possessory interests in that property.

██

¶ 10. Although it is true that the Fourth Amendment protects both "privacy" and "property" from unlawful government intrusion, *Soldal v. Cook County*, 506 U.S. 56, 60–72 (1992), established Fourth Amendment principles do not support *Blair*'s and *Lacey*'s

490

crabbed reading of the scope of a valid third-party consent. *Soldal*, upon which Ramage also relies, held that the unlawful forcible removal of the Soldals' mobile home by deputy sheriffs violated the Fourth Amendment's protection against the "seizure" of property (thus establishing a predicate for an action under 42 U.S.C. § 1983) even though the deputies had not invaded any of the Soldals' privacy rights—"the officers had not entered Soldal's house, rummaged through his possessions." *Id.*, 506 U.S. at 62. *Soldal* accordingly recognized that there could be a "seizure" of property in violation of the Fourth Amendment even though the seizure was not preceded or accompanied by a "search." *Id.*, 506 U.S. at 68.

¶ 11. Significantly, however, *Soldal* also specifically recognized that a valid consent permits a lawful Fourth-Amendment seizure. *Id.*, 506 U.S. at 66 ("[I]n the *absence of consent* or a warrant permitting the seizure of the items in question, such seizures can be justified only if they meet the probable-cause standard, and if they are unaccompanied by unlawful trespass.") (emphasis added; internal citations and footnote omitted). This is consistent with established authority. Thus, *United States v. Matlock*, 415 U.S. 164 (1974), permitted the use of money seized pursuant to a search authorized by valid third-party consent in Matlock's bank-robbery trial. *Id.*, 415 U.S. at 166 ("[T]he voluntary consent of a third party to search the living quarters of the respondent was legally sufficient to render the seized materials admissible in evidence at the respondent's criminal trial."). Similarly, *Frazier v. Cupp*, 394 U.S. 731 (1969), recognized that a valid third-party consent to search a duffel bag allowed law-enforcement personnel to take the defendant's

clothing in the duffel bag, emphasizing that they "were clearly permitted to seize it." *Id.*, 394 U.S. at 740.

██

¶ 12. As *Matlock* notes, enforcement of a valid third-party consent stems from the property owner's relinquishment of his or her Fourth Amendment right to privacy in the property by virtue of the third party's relationship with the property and the owner: "The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements." *Matlock*, 415 U.S. at 172 n.7. The attempt by *Blair* and *Lacey*, therefore, to restrict valid third-party consents only to searches does not wash. *See United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009) (applying to a "seizure" the law governing valid third-party consents to searches) (safe taken from residence; subsequent search warrant authorized opening the safe); *State v. Guthrie*, 627 N.W.2d 401, 423 (S.D. 2001) (third party with "common authority" over the defendant's personal property may validly consent to the property's seizure) (third party brought the property to law enforcement).

██

¶ 13. As we have seen, Folger specifically gave the detective the right to "conduct a complete search of . . . [m]y premises, and all property found therein, located at" the Ramage/Folger apartment. Further, Folger also permitted the detective to take the computers away for further analysis as long as they were "returned prior to [Ramage's] arrival back to the residence that subsequent week." Folger's agreement that the detective could take the computers out of the apartment so they could be subject to what the pre-printed form referred to as a "complete search," and what the detective

testified was "further analysis" gave the detective the right under the Fourth Amendment to do what he did.

¶ 14. As an alternative contention in support of his argument that the trial court erred in not suppressing evidence of the child-pornography images, Ramage asserts "that even if the seizure were justified, the police could not search the computers without a warrant." This contention, however, ignores that Folger, as we have seen, gave the police permission to access the computers. Indeed, Ramage recognizes, as phrased by his reply brief on this appeal, that under the scope of Folger's consent, the detective "could have turned on the computers" in the apartment.[6] In any event, as the circuit court observed, this case is similar to *State v. Petrone*, 161 Wis. 2d 530, 468 N.W.2d 676 (1991), which recognized that where law-enforcement personnel seize unprocessed film pursuant to a search warrant, that seizure encompasses the off-the-premises development of the film even though the film might not have been covered by the warrant. *Id.*, 161 Wis. 2d at 539–550, 468 N.W.2d at 678–683.

¶ 15. In *Petrone*, police got search warrants for "all camera, film, or photographic equipment used in the taking, processing and development of photographic pictures, involving nude and partially nude female juveniles." *Id.*, 161 Wis. 2d at 538, 468 N.W.2d at 678. In executing the warrant, they discovered the unprocessed film, which they seized and later processed. *Ibid.* In rejecting the defendant's contention that a separate search warrant was needed before the officers could develop the film, *Petrone* recognized that processing the film was within the ambit of the original warrant because "[t]he only way to peruse the film

---

[6] As we have noted, the screen on the laptop was broken.

contained in the cannisters, which the deputies had a right to do under the search warrant, was to remove the film from the home and develop and view it to determine its relevance to the crime described in the warrant." *Id.*, 161 Wis. 2d at 543, 468 N.W.2d at 680. Here, as we have seen, the scope of Folger's admittedly valid consent to examine and access the computers carried over to where the computers were accessed once the detective took them to the police department. As a practical matter, Folger's consent was akin to the warrant in *Petrone*—it permitted the detective to search the computers just as the warrant in *Petrone* permitted the officers to search the film. Accordingly, just as no separate warrant was needed in *Petrone*, the police here did not need any authorization beyond Folger's consent to access the computers.

¶ 16. Ramage contends, however, that insofar as *Petrone* is read to not require a search warrant to access his computers outside of the apartment, the decision is at odds with *Walter v. United States*, 447 U.S. 649 (1980). We disagree.

¶ 17. In *Walter*, films were mis-delivered by a private carrier to a company that called the Federal Bureau of Investigation because the films' packaging revealed that the films might have been obscene. *Id.*, 447 U.S at 651–652. The FBI screened the films without first getting a search warrant. *Id.*, 447 U.S at 652. In reversing the denial of a motion to suppress evidence of the films, *Walter*, in an opinion by Justice John Paul Stevens announcing the Court's judgment and joined-in by Justice Potter Stewart, ruled that even though the "FBI agents were lawfully in possession of the boxes of film," "the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. It was a search;

494

there was no warrant; the owner had not consented; and there were no exigent circumstances." *Id.*, 447 U.S at 654.[7] Here, of course, there was a valid third-party "consent"—Folger's agreement that the detective could remove the computers from her apartment and, as phrased by the written consent form, "conduct a complete search of . . . all property found" in the apartment. *Walter* is not on point. Neither is *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999), on which Ramage also relies.

¶ 18. In *Carey*, the defendant consented to a warrantless search of his apartment for illegal drugs and related material. *Id.*, 172 F.3d at 1270. The officers "also discovered and took two computers, which they believed would either be subject to forfeiture or evidence of drug dealing." *Ibid.* Once they got the computers back to their office, the officers got another search warrant that authorized them to search "the computers for 'names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances.' " *Ibid.* "This search produced no files 'related to drugs.' " *Id.*, 172 F.3d at 1271. The officers, however, found child pornography on the computers. *Ibid.* Concluding that

---

[7] Justice Thurgood Marshall joined in the Court's judgment without either joining in Justice Stevens's opinion or by writing a separate concurring opinion. *Walter v. United States*, 447 U.S. 649, 660 (1980). Justice Byron R. White wrote a concurring opinion, in which Justice William J. Brennan, Jr., joined, that agreed with Justice Stevens's conclusion that under the circumstances, the FBI should have gotten a search warrant to view the films. *Ibid.* Justice Harry Blackmun wrote a dissenting opinion in which Chief Justice Warren E. Burger, and Justices Lewis F. Powell and William H. Rehnquist joined. *Id.*, 447 U.S. at 662.

the discovery of the child pornography exceeded the scope of the warrant, *Carey* reversed the trial court's order denying Carey's motion to suppress. *Id.*, 172 F.3d at 1276. It pointed out that even though the pornographic images were discovered during the execution of the validly issued search warrant, which, as noted, was for evidence of drug dealing, the officers should have stopped their search of the computer when no drug-related files were discovered. *Id.*, 172 F.3d at 1272–1276. As *Carey* opined: "The Supreme Court has instructed, 'the plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.' " *Id.*, 172 F.3d at 1272 (quoted source omitted). Here, of course, as we have already seen at some length, unlike the situation in *Carey*, the search of the computers was in the scope of Folger's consent. Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.