NEUBAUER, C.J.
*271 ¶ 1 Dorian M. Torres appeals *272 from a judgment of conviction and challenges the denial of his motion to suppress, asserting that police discovered evidence through a warrantless and unlawful search of his apartment. We conclude that police reasonably relied on third-party consent for the search, making a warrant unnecessary and the search lawful. We affirm.
BACKGROUND
¶ 2 Seventeen-year-old Dorian lived in an apartment with his father, Emilio Torres. Dorian's mother, Shelly Torres, and Emilio were divorced in 2009.[1] Although living apart, Shelly and Emilio were coparenting Dorian.[2] They spoke with each other regularly.
¶ 3 Emilio gave an apartment key to Shelly. He told her that "he wanted [her] to hang on to the key in case [she] needed to ... do anything that he needed or that Dorian needed or just to check on Dorian." Emilio would ask Shelly to run errands for him, involving such matters as mail, food, and apartment cleaning. Shelly had been in his apartment "many times."
¶ 4 Despite speaking with each other often, Emilio failed to return Shelly's calls on January 24, 2014. She called his phone "quite a few times during the weekend with no response." Shelly considered Emilio's nonresponsiveness unusual. She called his employer, who told her that Emilio had been absent.
¶ 5 On January 28, Dorian went to Shelly's house, and she asked him where Emilio *391 was. Dorian told her that he had gone to Texas. It was out of *273 character for Emilio to leave without telling Shelly. Dorian also told Shelly that Emilio gave his bank card to Dorian, telling him that he could have the money. Dorian asked for Emilio's social security number and the personal identification number for the bank card. His requests unsettled Shelly.
¶ 6 On January 29, she called the police at around 10:00 p.m. to report Emilio missing. Officer Brian Inger went to Shelly's home. She told him that she had not heard from Emilio for almost a week and described her troubling conversations with Dorian. Inger said that police would contact Emilio's employer and get back to her. Shelly responded that she was going to Emilio's apartment to check on the situation. Inger told her that police should go along for safety reasons.
¶ 7 Inger and Shelly went to the apartment where they met with Sergeant Timothy Patton outside. Shelly thought they had arrived around 10:30 p.m. or 11:00 p.m. Patton thought it was somewhere between 11:00 p.m. and 12:45 a.m.
¶ 8 Shelly used her key to unlock the door. She did not knock, and there was no doorbell. She allowed the officers to enter behind her. Nearby, Dorian was sitting on a living room couch. Shelly questioned Dorian about Emilio's whereabouts and then went to Emilio's bedroom. She knew where Emilio typically kept his suitcase, so she intended to see if it was there. Patton followed.
¶ 9 When Shelly entered the bedroom, the window was wide open and the room felt very cold. It was in "disarray" with clothes scattered everywhere. A mattress leaned against a wall. Standing in the doorway and watching, Patton then entered to help Shelly move the mattress. Behind the mattress, Patton saw *274 what appeared to be a wrapped-up body. The body turned out to be Emilio.
¶ 10 Meanwhile, Inger talked with Dorian in the living room about Emilio's whereabouts. Patton called Dorian to the bedroom and asked what the wrapped object was. Dorian responded something similar to, "What's that?" Patton then arrested Dorian, who was charged with first-degree intentional homicide.
¶ 11 Dorian moved to suppress the evidence stemming from the search of the apartment, asserting that the lack of a warrant rendered the search unconstitutional.[3] After hearing testimony from Shelly and Patton, the circuit court denied the motion, reasoning as follows. The officers had lawfully entered Emilio's apartment and found his body while acting as "community caretaker[s]," an exception to the warrant requirement. They objectively believed that Emilio was in jeopardy, and the public highly values locating missing persons. Shelly and Emilio shared a parental interest in supervising seventeen-year-old Dorian. She used her key to peacefully allow the officers into the apartment, acting
within the scope of [her] authority given to her by Emilio in that Emilio wanted her to assist in parenting Dorian. Dorian was 17 at the time of this incident. He was a minor. And it's certainly consistent with [their parental interest] to see that Dorian is properly cared for [and] that Shelly would want to make sure that there was parental supervision in the residence.
The officers had Shelly's permission to enter the apartment.
¶ 12 After a bench trial, the circuit court convicted Dorian as charged. Dorian appeals.
*392 *275 DISCUSSION
Standard of Review
¶ 13 The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." We generally have applied our state constitutional protections in the same way as the United States Supreme Court has applied the protections under the Fourth Amendment. State v. Sobczak , 2013 WI 52, ¶ 11 n.4, 347 Wis. 2d 724, 833 N.W.2d 59.
¶ 14 Whether law enforcement has violated that guarantee presents a question of constitutional fact. State v. Tomlinson , 2002 WI 91, ¶ 19, 254 Wis. 2d 502, 648 N.W.2d 367. We therefore generally defer to the circuit court's findings of evidentiary and historical fact, leaving them undisturbed unless clearly erroneous, but we independently apply those facts to the law. State v. Matalonis , 2016 WI 7, ¶ 28, 366 Wis. 2d 443, 875 N.W.2d 567.
Officers Received Valid Third-Party Consent from Shelly
¶ 15 Warrantless searches are presumptively unreasonable. See State v. Matejka , 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891. That presumption may be overcome under certain circumstances. See State v. Pinkard , 2010 WI 81, ¶ 13, 327 Wis. 2d 346, 785 N.W.2d 592. Two such sets of circumstances, both asserted by the State in this case, are: (1) when officers perform the search while serving as community caretakers and (2) when officers have received consent *276 for the search by an authorized individual. Matalonis , 366 Wis. 2d 443, ¶ 30, 875 N.W.2d 567 ; Sobczak , 347 Wis. 2d 724, ¶ 11, 833 N.W.2d 59.
¶ 16 We conclude that the officers reasonably relied on Shelly's apparent authority to consent to the officers' entry into the apartment. Because we rest our holding on consent, we do not address the community caretaker exception.[4]
¶ 17 Police may conduct a warrantless search when authorized consent has been given, which can include consent from someone who is not the subject of the search-a third party. Tomlinson , 254 Wis. 2d 502, ¶ 22, 648 N.W.2d 367. For such consent to be valid, the third party must "possess[ ] common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock , 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). The authority needed for
third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.
Id. at 171 n.7, 94 S.Ct. 988 (citations omitted). We look to the sufficiency of the consenting individual's relationship to the premises to determine mutual use by persons generally having joint access or control for most purposes. See id.
*277 ¶ 18 "As Matlock notes, enforcement of a valid third-party consent stems *393 from the property owner's relinquishment of his or her Fourth Amendment right to privacy in the property by virtue of the third party's relationship with the property and the owner." State v. Ramage , 2010 WI App 77, ¶ 12, 325 Wis. 2d 483, 784 N.W.2d 746.
Consents define the extent of the privacy interest a person seeks to assert.... The underpinning of third-party consent is assumption of risk[.] One who shares a house or room or auto with another understands that the partner may invite strangers-that his privacy is not absolute, but contingent in large measure on the decisions of another.
United States v. Chaidez , 919 F.2d 1193, 1202 (7th Cir. 1990) (citations omitted); Sobczak , 347 Wis. 2d 724, ¶ 18, 833 N.W.2d 59.
¶ 19 The authority of the third party may be either actual or apparent, as long as, in the case of apparent authority, reliance on the authority is reasonable. State v. Kieffer , 217 Wis. 2d 531, 548, 577 N.W.2d 352 (1998). Whether a person has authority to consent is dependent on the totality of the circumstances, and the State has the burden of proving valid third-party consent by clear and convincing evidence. Tomlinson , 254 Wis. 2d 502, ¶¶ 21, 31, 648 N.W.2d 367.
¶ 20 The evidence that shows Shelly's "common authority over or other sufficient relationship to" the apartment is considerable. Matlock , 415 U.S. at 171, 94 S.Ct. 988. By the time Shelly permitted the police to enter the apartment, the police knew the following. Shelly was Emilio's *278 former wife and Dorian's mother. They were coparenting Dorian. Emilio had given an apartment key to Shelly and asked her to enter his apartment for various reasons, including to "check on" Dorian. Shelly had been in the apartment "many times" and spoke with Emilio regularly. She showed genuine concern for Emilio's welfare and, after reporting him missing, told police that she was going to the apartment herself. At the apartment door, Shelly did not knock or call out, but straightaway opened the locked door with her key and entered, bringing the officers with her. Dorian voiced no objection to the entry or search. See Tomlinson , 254 Wis. 2d 502, ¶¶ 28, 34, 37, 648 N.W.2d 367 (consent is supported when the defendant expresses no opposition to the entry taking place nearby); State v. St. Germaine , 2007 WI App 214, ¶ 21, 305 Wis. 2d 511, 740 N.W.2d 148 (defendant's silence bolstered the reasonableness of the officers' belief that they had consent to search). Viewing the foregoing circumstances would plainly "warrant [an officer] of reasonable caution in the belief that [Shelly] had authority over the premises" to consent to entry into the apartment. Kieffer , 217 Wis. 2d at 542, 577 N.W.2d 352. Because the officers' reliance on her apparent authority was reasonable, a warrant was unnecessary.[5] Tomlinson , 254 Wis. 2d 502, ¶ 38, 648 N.W.2d 367.
¶ 21 Dorian argues that Shelly lacked authority to consent because several important facts were missing, citing to Sobczak . In that case, the defendant, who lived with his parents, invited his girlfriend of three months to spend the weekend. The next day, the defendant went to work, leaving his girlfriend alone in the home and allowing her to use his personal laptop. After *279 noticing images on the laptop that might constitute child pornography, the police were called, and she allowed an officer to enter into the common area and view the images. *394 ¶ 22 Rejecting the defendant's argument that a weekend guest had no authority to consent to the search, the supreme court provided a nonexhaustive list of several considerations, viewing the following "factors" as especially relevant to the circumstances of that case involving an invited guest: (1) the relationship of the consenter to the defendant, to include familial connections and social ties; (2) the duration of the consenter's stay; and (3) permitting the consenter to be home alone. Sobczak , 347 Wis. 2d 724, ¶ 20, 833 N.W.2d 59. The court concluded that the first and third factors demonstrated that the girlfriend had authority to consent. Id. , ¶ 25. "[W]e believe society would expect a girlfriend of three months, left alone in a home and given unrestricted access to the common areas of the home, to enjoy the authority to invite guests in to those common areas, even with potentially deleterious consequences to her boyfriend." Id.
¶ 23 Dorian asserts that, in this case, there was no familial or romantic relationship, the duration of Shelly's stay was nonexistent, and no one asked Shelly to be in the apartment alone. Thus, he asserts, Sobczak supports his position. We disagree.
¶ 24 The first Sobczak consideration-Shelly's relationships with Emilio and Dorian-strongly favors a determination that she had authority to consent.[6]
*280 Presumably, Dorian's assertion that "there was no familial or romantic" relationship is based on the fact that Shelly and Emilio were no longer married. Despite the divorce, however, Shelly and Emilio plainly had a supportive and ongoing multiyear relationship, and they shared parental responsibilities over Dorian. Indeed, Shelly's relationships with Emilio and Dorian, as cooperative former spouse and mother of a teenager, rose to a level well beyond Sobczak 's three-month dating relationship. As the circuit court found, they shared the parental interest of wanting "to see that Dorian is properly cared for" and ensuring "that there was parental supervision in the residence."
¶ 25 The third Sobczak factor-permitting Shelly to be in the apartment alone-also favors a conclusion that she had authority to consent. The purpose of the key was to allow Shelly to enter the apartment when Emilio was at work or elsewhere; here, the key constitutes permission to be in the apartment alone. If Emilio did not want Shelly to be there by herself, he would not have given the key to her.[7] Allowing Shelly to enter the apartment "alone where there are no indicia that [Emilio] placed any restrictions on her use of the *281 property is a powerful sign that she had the authority to" consent to a search. See Sobczak , 347 Wis. 2d 724, ¶ 23, 833 N.W.2d 59 ; see also United States v. Rodriguez , 888 F.2d 519, 523 (7th Cir. 1989) *395 (former wife's "possession of the key gave her apparent authority to consent"). "To extend such trust" to Shelly, Emilio "must have envisioned her 'mutual use of the property' and her possession of 'joint access or control for most purposes.' " See Sobczak , 347 Wis. 2d 724, ¶ 22, 833 N.W.2d 59 (quoting Matlock , 415 U.S. at 171 n.7, 94 S.Ct. 988 ).
¶ 26 It is true that Sobczak 's second consideration-duration of the stay-is presumably short. Dorian highlights this factor by suggesting that "[t]here are no known cases in which a person who was not even a guest in the home at the time was held to have authority to" consent. While a stay's length "can shed light on [the consenter's] authority to allow visitors in," that factor "alone does not settle the question." Sobczak , 347 Wis. 2d 724, ¶ 20, 833 N.W.2d 59. Unlike the girlfriend in Sobczak , who had never been to the defendant's residence before, Shelly had been at the apartment "many times," tantamount to many stays. She provided food, cleaned the apartment and supervised Dorian-all of which involve time spent at the apartment as a parent. We believe society would expect a mother, granted permission to be alone in a home and given unrestricted access to the home in order to care for her son's needs and welfare, enjoys the authority to invite guests into the apartment. Id. , ¶ 25. That Shelly was not staying overnight at the apartment at the time is "insufficient to outweigh the more compelling factors militating in favor of authority to consent." Id.
*282 ¶ 27 Further, and contrary to Dorian's assertion, other courts have found authority to consent despite the consenter not staying overnight at the time.[8] See, e.g. , United States v. Garcia , 690 F.3d 860, 864 (7th Cir. 2012) (because defendant's eighteen-year-old niece often took care of his child and had full access to his apartment with a key, she had apparent authority to consent); United States v. Garcia-Jaimes , 484 F.3d 1311, 1323-24 (11th Cir. 2007) (because the defendant's aunt rented the apartment for him, had full access, and routinely went there even if no one was home, she had apparent authority to consent), abrogated in part on other grounds by Regalado Cuellar v. United States , 553 U.S. 550, 556, 128 S.Ct. 1994, 170 L.Ed.2d 942 (2008) ; see also, e.g. , *283 Rodriguez , 888 F.2d 519 ; Young v. Suffolk Cty. , 922 F.Supp.2d 368 (E.D. N.Y. 2013) ; United States v. Ryerson , 545 F.3d 483 (7th Cir. 2008).
¶ 28 Shelly's status as Emilio's former spouse and as Dorian's mother, her ongoing *396 communications with Emilio, her coparenting of Dorian with Emilio, her ready and shared access to the apartment with the key, her willingness to assist Emilio with household-related tasks, her many visits to the apartment, her authority to "check on" Dorian, a minor, at the apartment, her earnest concern for Emilio's welfare, her determination to go to the apartment by herself on the night she reported him missing, her lack of hesitation and direct entry and search of the apartment, and the absence of any objection to the entry by Dorian all conveyed to the officers her mutual use of and joint access to the premises, sufficient to provide apparent authority to permit the police to enter the apartment.[9]
By the Court. -Judgment affirmed.

Because of the shared last name, we will identify members of the Torres family by first name.

The material facts are not disputed. The factual background is taken from the motion hearing testimony of Shelly and an officer involved in the entry into the apartment.

Dorian filed several other suppression motions that are not relevant on appeal.

Dorian limits the issue to whether Shelly had authority to consent. On appeal, no challenge is made to whether consent was given or to what specifically occurred beyond entry into the apartment.

We do not address whether Shelly also had actual authority because "[a]pparent authority is enough." United States v. Rodriguez , 888 F.2d 519, 523 (7th Cir. 1989).

In Sobczak , as in most cases, this consideration pertained to the relationship between the consenter and the defendant. Here, however, we look at Shelly's relationship with Emilio in addition to her relationship with Dorian. Being the lone adult resident of the premises and father of the other resident, Emilio's authority over the apartment was the source of Shelly's, surpassing, if not eclipsing, Dorian's. See State v. Tomlinson , 2002 WI 91, ¶ 30, 254 Wis. 2d 502, 648 N.W.2d 367 (parental authority to consent to a search of property is generally superior to that of a child). In any event, Dorian did not object to the entry or search.

As noted, one of the stated reasons for Shelly to enter the apartment was to "check on" Dorian. Shelly would have needed a key for that purpose if Dorian was unwilling or unable to open the door, or to simply check on the safety of his home environment when he was not there. It is reasonable to infer that Emilio and Shelly considered it a parental right to enter the apartment regardless of their minor son's wishes.

Dorian also asserts that a third party's authority to consent is undermined when an actual resident is present and has not been asked for consent, as was the case here. We disagree. Nothing about Dorian's presence diminishes Shelly's authority to enter the apartment of her minor son-which is founded upon the multitude of circumstances discussed above-particularly when he voiced no objection at the time. The officers already had sufficient information to reasonably believe that Shelly had the necessary authority, and Dorian fails to explain why they had an obligation to also request consent from Shelly's minor son. See Georgia v. Randolph , 547 U.S. 103, 122, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) ("For the very reason ... it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received."); Rodriguez , 888 F.2d at 523 ("Going beneath the surface of the information in hand ... would make the outcome of the search depend on the niceties of property or marital law far removed from the concerns of the Fourth Amendment.").

Dorian appears to argue that Emilio only wanted Shelly to enter the apartment when Emilio called her first. Shelly testified that she would go to the apartment when he asked for her help, but that does not mean that she was prohibited from going at other times or on her own initiative, and Dorian offers no evidence to show otherwise. Indeed, Emilio told her to enter the apartment to "check on" Dorian, which presumably she could do on her own. Further, if Emilio's intent is being considered, given that Shelly had Emilio's permission to enter the apartment to perform mundane tasks (e.g., mail, food, and cleaning), it is reasonable to infer that he certainly would have wanted Shelly to enter the apartment in the more critical event of his or Dorian's mysterious disappearance.