COURT OF APPEALS
DECISION
DATED AND FILED

August 17, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.    2022AP1855
2022AP1856
2022AP1857
STATE OF WISCONSIN**

Cir. Ct. Nos.   2019FO20
2019FO21
2019FO22

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

RICHARD CHAD QUINLAN,

    DEFENDANT-APPELLANT.

APPEAL from judgments of the circuit court for Jackson County: ANNA L. BECKER, Judge. *Affirmed*.

¶1    KLOPPENBURG, P.J.[1]  Richard Quinlan pleaded no contest to several game-related charges.  On appeal, Quinlan challenges the circuit court's

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(g) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

denial of his motion to suppress evidence of statements he made to two Department of Natural Resources wardens after Quinlan's girlfriend allowed the wardens to enter the cabin in which Quinlan was residing.[2]  Quinlan argues that the circuit court erroneously exercised its discretion by failing to apply the proper legal analysis under the Fourth Amendment.  Quinlan further argues that the court erred in failing to conclude that his girlfriend lacked authority to consent to the wardens' entry into the cabin.  Thus, he contends, the statements he made during the conversation that followed the wardens' entry into the cabin must be suppressed.

¶2      I agree that Quinlan's motion implicates the Fourth Amendment and requires a determination of whether his girlfriend had authority to consent to the wardens' entry into the cabin.  The circuit court did not reach a conclusion on this issue.  Nevertheless, the relevant undisputed facts—taken from testimony at the motion hearing credited by the circuit court and the portions of the audio recording of the incident that were played at the hearing—establish as a matter of law that the wardens had a reasonable basis to believe that Quinlan's girlfriend had authority to consent to entry into the cabin.  Therefore, the wardens did not violate Quinlan's Fourth Amendment rights when they entered the cabin and spoke with him.  Accordingly, I affirm.

---

[2] A defendant who pleads guilty or no contest to criminal charges forfeits the right to raise almost all non-jurisdictional defects, including constitutional claims, on appeal. ***State v. Multaler***, 2002 WI 35, ¶54, 252 Wis. 2d 54, 643 N.W.2d 437.  We have referred to this proposition as the "guilty plea waiver rule."  WISCONSIN STAT. § 971.31(10) is a "narrowly crafted exception" to the guilty plea waiver rule that "permits appellate review of an order denying a motion to suppress evidence, notwithstanding a guilty [or no contest] plea." ***State v. Conner***, 2012 WI App 105, ¶15, 344 Wis. 2d 233, 821 N.W.2d 267.

## BACKGROUND

¶3    At the hearing on Quinlan's motion to suppress, both Quinlan's mother and one of the two wardens who spoke with Quinlan testified. Additionally, portions of an audio recording of the incident at issue were played. The following facts are taken from the testimony implicitly credited by the circuit court and the portions of the audio recording played at the hearing.

¶4    In the course of investigating Quinlan's hunting practices, the wardens drove to "Quinlan's property" at about 9:00 a.m. on a date when they "knew" that he was at the property. "No trespassing" signs were posted on two trees along the driveway.

¶5    The wardens were in plain clothes and arrived in an unmarked truck. When the wardens arrived at the property, they approached the house and saw Quinlan's mother outside. The wardens identified themselves and explained that they wanted to ask Quinlan a few questions. Quinlan's mother confirmed that Quinlan was home, pointed to the cabin 50 feet from the house, and said that he was there with his girlfriend. The wardens asked to knock on the door of the cabin to speak with Quinlan and Quinlan's mother agreed.

¶6    The wardens then knocked on the door of the cabin. Quinlan's mother was still speaking to the wardens when a woman opened the door and asked, "What's up?" One of the wardens recognized the woman as Quinlan's girlfriend based on his observation of Quinlan's hunting channel and YouTube videos. The warden who recognized the woman, without identifying himself or the other warden as wardens, asked if they could come into the home and the woman replied, "Yeah." As soon as they entered the one-room cabin, the wardens

could see Quinlan on the couch or bed inside. The wardens greeted Quinlan when they were inside the cabin and Quinlan responded within three seconds of his girlfriend giving the wardens permission to enter. The wardens identified themselves and Quinlan acknowledged that he recognized them both from previous interactions and confirmed that he had received one of the wardens' prior unsuccessful attempts to contact him. That warden then asked Quinlan if Quinlan had "a few minutes for [them]?" to which Quinlan responded "yeah." The warden then said "Where would you like to talk? We can talk in here or we could …" and Quinlan cut him off to say "right here is fine."

¶7      In the ensuing conversation, Quinlan admitted to several game-related violations. The wardens told Quinlan that they would get back in touch with him soon about how they would be moving forward. Quinlan then thanked the wardens and they continued to have small talk until the wardens departed. The wardens left within an hour of arriving on the property.

¶8      The State subsequently charged Quinlan with several game-related violations. Pertinent here, Quinlan moved to suppress the statements he made to the wardens at the cabin based on lack of consent to enter.[3] At the conclusion of a motion hearing in May 2022, the circuit court denied the motion.

¶9      Quinlan appeals.

---

[3] Quinlan also filed motions to dismiss and to suppress on other grounds, all of which were denied by the circuit court without argument from Quinlan. These other motions are not at issue on appeal.

## DISCUSSION

*Applicable standard of review and legal principles*

¶10    "Whether evidence should be suppressed is a question of constitutional fact subject to a two-step inquiry."  **State v. Wilson**, 2022 WI 77, ¶17, 404 Wis. 2d 623, 982 N.W.2d 67.  "First, we will uphold a circuit court's findings of fact unless they are clearly erroneous."  **Id.**, ¶18.  "Second, the application of constitutional principles to those facts presents a question of law that we review independently of the … circuit court[.]"  **Id.**

¶11    Both the Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution protect "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV; WIS. CONST. art. I, § 11.[4]  Our supreme court has recognized this protection as "one of the core constitutional guarantees found in the United States Constitution."  **Wilson**, 404 Wis. 2d 623, ¶19.  The Fourth Amendment "was drafted in part to codify 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'"  **State v. Scull**, 2015 WI 22, ¶19, 361 Wis. 2d 288, 862 N.W.2d 562 (quoting **Payton v. New York**, 445 U.S. 573, 601 (1980)).  "[W]hen it comes to the Fourth Amendment, the home is first among equals.  At the

---

[4]  The Fourth Amendment is made applicable to the states by the Fourteenth Amendment. **State v. Kramer**, 2009 WI 14, ¶18 and n.6, 315 Wis. 2d 414, 759 N.W.2d 598.  The current approach in Wisconsin is to interpret art. I, § 11 of the Wisconsin Constitution "consistently with the Fourth Amendment."  **State v. Richter**, 2000 WI 58, ¶27, 235 Wis. 2d 524, 612 N.W.2d 29; **State v. Felix**, 2012 WI 36, ¶4, 339 Wis. 2d 670, 811 N.W.2d 775 ("We continue our usual practice of interpreting Article I, Section 11 of the Wisconsin Constitution in accord with the United States Supreme Court's interpretation of the Fourth Amendment.").

Amendment's 'very core' stands 'the right of a [person] to retreat into [the person's] own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *Wilson*, 404 Wis. 2d 623, ¶19.

¶12    A warrantless search of a home is presumptively unreasonable under the Fourth Amendment unless an exception to the warrant requirement applies. *State v. Dalton*, 2018 WI 85, ¶38, 383 Wis. 2d 147, 914 N.W.2d 120. "One such exception … 'recognizes the validity of searches with the voluntary consent of an individual possessing authority.'" *State v. Sobczak*, 2013 WI 52, ¶11, 347 Wis. 2d 724, 833 N.W.2d 59 (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (the prohibition against unreasonable searches and seizures "does not apply … to situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises") (internal citation omitted).

¶13    Pertinent here, "[p]olice may conduct a warrantless search when authorized consent has been given, which can include consent from someone who is not the subject of the search—a third party." *State v. Torres*, 2018 WI App 23, ¶17, 381 Wis. 2d 268, 911 N.W.2d 388 (citing *State v. Tomlinson*, 2002 WI 91, ¶22, 254 Wis. 2d 502, 648 N.W.2d 367). "For such [third party] consent to be valid, the third party must 'possess[] common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *Torres*, 381 Wis. 2d 268, ¶17 (quoting *United States v. Matlock*, 415 U.S. 164, 171, (1974)). As the U.S. Supreme Court in *Matlock* explained,

> The authority which justifies the third-party consent does not rest upon the law of property, … but rests rather on

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in [the co-inhabitant's] own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7.

¶14     The authority of the third party may be either actual or apparent. *State v. Kieffer*, 217 Wis. 2d 531, 548, 577 N.W.2d 352 (1998).  "[E]ven if a third party lacks actual common authority to consent to a search of the defendant's residence, police may rely upon the third party's apparent common authority to do so, if that reliance is reasonable." *Id.*  The court must determine, as a question of law, whether the information available to the officer at the time of the search would justify a reasonable belief that the person consenting had the authority to do so. *Id.*  This is an objective test, based on the totality of the circumstances. *Id.*; *Torres*, 381 Wis. 2d 268, ¶19.  A court need not address the question of whether the person giving consent had actual authority to consent if the court concludes that the person had apparent authority to consent.  *See Tomlinson*, 254 Wis. 2d 502, ¶26 ("[W]e agree with the State's argument that the girl had apparent authority to give the police limited consent to enter, and therefore, we are not required to address the question of whether or not the girl had actual authority to consent.").[5]

---

[5]  The State argues that the wardens' entry into the cabin was not a search and seizure in violation of the Fourth Amendment because the entry was simply an extension of a "knock and talk" encounter during which "a reasonable person would feel free to leave."  The State's argument lacks merit, as I now explain.

(continued)

7

*Analysis*

¶15    Quinlan argues that the wardens violated the Fourth Amendment when they entered the cabin as part of their investigation, before Quinlan voluntarily spoke to them.  Quinlan does not dispute, as a factual matter, that his girlfriend consented to the wardens' entry into the cabin.  However, Quinlan argues that his girlfriend did not have the authority under the Fourth Amendment to give that consent.  As explained below, I conclude that Quinlan's girlfriend possessed apparent authority to consent to the wardens entering the cabin.

¶16    In *Tomlinson*, police officers were permitted entry into the defendant's home by a teenage girl who answered the door.  *Tomlinson*, 254 Wis. 2d 502, ¶7.  The defendant argued that the girl lacked authority to consent to their entry because there was nothing in the record to show that the girl was one of

---

A "knock and talk" is an investigative technique that "law enforcement may use in entering one's constitutionally-protected curtilage." *State v. Wilson*, 2022 WI 77, ¶21, 404 Wis. 2d 623, 982 N.W.2d 67.  "Curtilage" is the constitutionally protected area "immediately surrounding and associated with the home." *Oliver v. United States*, 466 U.S. 170, 180 (1984); *State v. Martwick*, 2000 WI 5, ¶26, 231 Wis. 2d 801, 604 N.W.2d 552.  "A 'knock and talk' investigation is not a search but instead is an investigative technique premised on the implicit license that a visitor, or neighbor, would have with regard to entering one's curtilage." *Wilson*, 404 Wis. 2d 623, ¶21.

The State cites no legal authority extending the "knock and talk" concept to entry into one's home from the curtilage.  The law summarized in the text clearly states that an officer's entry into one's home without a warrant is a presumptively unreasonable search unless an exception to the warrant requirement applies.  The exception pertinent here is consent by one with authority to consent.  As explained below, I conclude that such consent existed here and, therefore, affirm the denial of Quinlan's suppression motion.

The circuit court accepted the State's "knock and talk" argument and denied Quinlan's motion to suppress on that basis.  I reject Quinlan's argument that the circuit court's failure "to apply the correct legal standard" warrants reversal, because I review de novo the issue of whether the wardens' entry into the cabin violated the Fourth Amendment.  *See Wilson*, 404 Wis. 2d 623, ¶18; *State v. Kieffer*, 217 Wis. 2d 531, 548, 577 N.W.2d 352 (1998).

8

Tomlinson's daughters. *Id.*, ¶27. The court disagreed, explaining that it was reasonable to conclude that the girl who answered the door was the defendant's daughter because the officers knew that he had two teenage daughters, the girl matched the description of the daughters, and the girl identified herself. *Id.*, ¶27-28. Thus, the court held that there was sufficient evidence for the officers to reasonably conclude that the girl who answered the door had apparent authority. *Id.*

¶17 Here, the warden recognized the woman who answered the door of the cabin as Quinlan's girlfriend, the same woman he had seen featured in videos that Quinlan posted online. Quinlan's mother had also, moments earlier, said that Quinlan was in the dwelling with "his girlfriend." As in *Tomlinson*, the warden's independent recognition and Quinlan's mother's statement could have led the warden to reasonably believe that the woman at the door was Quinlan's girlfriend. *See id.*, ¶27-28 ("Under these circumstances, it was more than reasonable for the officers to conclude that the girl who answered the door was one of Tomlinson's daughters.").

¶18 The wardens also could have reasonably believed that Quinlan's girlfriend had the authority to consent to their entry into the cabin based on the totality of the circumstances. Those circumstances include that they knew of her "social ties" to Quinlan and his mother through her romantic relationship with Quinlan. *See Sobczak*, 347 Wis. 2d 724, ¶20 (recognizing that a romantic relationship is a kind of "social tie" that gives rise to expectations supporting a reasonable belief that a person "has the constitutional authority to invite law enforcement into the home of another"). Further, when the wardens stepped into the one-room cabin, Quinlan was immediately present and available to speak, but

9

did not then, or at any point after the wardens entered the cabin, object to them entering or being in the cabin. Quinlan's mother, who was still speaking to the wardens when Quinlan's girlfriend opened the door, similarly did not object to the wardens' entering the cabin upon Quinlan's girlfriend's consent. *See **Tomlinson***, 254 Wis. 2d 502, ¶34 (recognizing that a defendant's lack of objection when a third party allows officers to enter the home is a factor when considering whether the third party had apparent authority to allow the officers to enter). In addition, Quinlan's girlfriend did not ask Quinlan or Quinlan's mother for permission to let the wardens in or hesitate to say "yeah" when the warden asked to enter. *See **id.*** ("Tomlinson did not object to the police coming in, and the daughter did not hesitate or turn to ask Tomlinson's permission to let the officers in. Under these circumstances, the officers reasonably could have believed that Tomlinson entrusted the girl with at least some authority to give consent to enter, and certainly with enough authority to allow the limited entry that occurred in this case.") Because Quinlan and his mother were present and did not object when his girlfriend said that the wardens could enter the cabin, the wardens could have reasonably believed that his girlfriend invited them to enter the cabin with the authority to do so.

¶19 Quinlan argues that the wardens did not make sufficient inquiry into his girlfriend's "relationship to the property" to support the reasonable belief that she had apparent authority to consent to their entry into the cabin. He notes that the wardens did not inquire as to her legal interest in the property, her right to invite guests into the cabin or on to the Quinlan property, her right to stay on and use the property in Quinlan's absence, whether she had a key to or personal belongings in the cabin, or how long she had been staying at the cabin. Quinlan argues that the wardens were required to inquire into these additional factors in

order to reasonably believe that his girlfriend had apparent authority to consent to their entry into the cabin, citing **Rodriguez**, 497 U.S. 177 and **Kieffer**, 217 Wis. 2d 531.

¶20     In **Rodriguez**, a former girlfriend of the defendant who previously lived in the defendant's apartment, occasionally spent overnights there when the defendant was present, and still had some of her belongings there, travelled with officers to the apartment to unlock the door with her key so that they could enter and arrest the defendant.  **Rodriguez**, 497 U.S. at 179-82.  The U.S. Supreme Court concluded that the former girlfriend lacked actual authority to give the officers permission to enter the apartment.  **Id.**  The Court remanded to the Illinois Appellate Court to determine whether the officers reasonably believed that the former girlfriend had the authority to consent.  **Id.** at 189.  In other words, the Court did not engage in an analysis of whether apparent consent existed. Therefore, this case is of no help to Quinlan.

¶21     In **Kieffer**, the defendant's father-in-law consented to police officers' search of the loft area of his garage, where the defendant and his wife were living. **Kieffer**, 217 Wis. 2d at 535-37.  The facts established that the defendant had a landlord-tenant relationship with his father-in-law and the father-in-law told the officers that he usually knocked before entering the loft area.  **Id.** at 543-47.  The father-in-law further testified that he would not enter the loft area without asking his daughter's and the defendant's permission.  **Id.**  Based on these facts, our supreme court concluded that the father-in-law lacked actual authority as well as apparent authority because the officers did not make a sufficient inquiry into the living situation.  Thus, the officers could not reasonably rely on the father-in-law's assertion that he had the authority to let them into the loft area.  **Id.** at 549-55.

11

¶22     *Kieffer* is also of no help to Quinlan because its facts are readily distinguishable from the circumstances here.  Most significantly, in that case the officers entered the defendant's living space with only the father-in-law's consent.  But here, it was Quinlan's girlfriend who consented to the wardens entering the cabin after they knocked on the door.  Moreover, neither Quinlan nor Quinlan's mother, both of whom were present at the time, objected.  No further inquiry was necessary for the wardens to have reasonably believed that Quinlan's girlfriend had the authority, in Quinlan's and his mother's presence, to give that consent.

¶23     Quinlan also argues that the wardens were required to, but did not inquire into, the factors listed in *Sobczak*, 347 Wis. 2d 724, ¶20.  Those factors are:  (1) the relationship of the consenter to the defendant, not only in the familial sense, but also in terms of social ties such as a romantic relationship between the two; (2) the duration of the consenter's staying in the premises, though "that alone does not settle the question"; (3) the defendant's decision to leave the consenter in the premises alone; and (4) "miscellaneous facts" such as whether the consenter was given a key, kept belongings in the premises, or lists the premises as the consenter's address on the consenter's driver's license.  *Id.*  However, the court in that case emphasized that this list of factors "is not exclusive but rather composed

12

with an eye to the facts of the case at bar. Other searches will no doubt implicate other factors that may assist in the inquiry." ***Id.***, ¶20 n.14.[6]

¶24  Here, at least some of these factors were known to the wardens, as discussed above, including that the woman was Quinlan's girlfriend and his mother told the wardens that the two were living together in the cabin, thereby establishing the romantic relationship and social ties that were considered to support actual consent in ***Kieffer***. Also, unlike in ***Kieffer***, Quinlan's mother told the wardens that Quinlan and his girlfriend were in the cabin and the wardens saw Quinlan when his girlfriend opened the door, so there was no need to inquire into whether Quinlan had let her stay in the cabin and allowed entry in his absence. Moreover, Quinlan disregards the other circumstances discussed above, namely that both Quinlan and his mother were present and did not object when his girlfriend let the wardens into the cabin. Quinlan fails to demonstrate that the totality of circumstances here are insufficient to show that the wardens could have had a reasonable belief that his girlfriend had authority to let them in.

---

[6] In ***Sobczak***, the question was whether the woman who let the officer enter into the living room of the defendant's house and view suspicious files on his computer had authority to do so. ***State v. Sobczak***, 2013 WI 52, ¶1, 347 Wis. 2d 724, 833 N.W.2d 59. The woman had been dating the defendant for about three months, was spending the weekend at the defendant's parents' residence at the defendant's invitation while his parents were away on vacation, was left alone in the home while the defendant was at work, and asked and received permission from the defendant to use his personal laptop to occupy herself in his absence. ***Id.***, ¶2. Accordingly, the court fashioned the factors listed in the text based on these facts. ***Id.***, ¶20. The court concluded that the woman had actual authority to consent to the officer's entry into the living room, a common area of the home, and search of the laptop, an object that she had been granted permission to use. ***Id.***, ¶¶32-33. I assume, without deciding, that the factors listed are also relevant to the issue of whether apparent authority is present.

**CONCLUSION**

¶25     For the reasons stated, I affirm the circuit court's denial of Quinlan's suppression motion.

*By the Court.*—Judgments affirmed.

This opinion will not be published.     *See* WIS. STAT. RULE 809.23(1)(b)4.

14